## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TARONIS FUELS, INC., *et al.*,[1] | ) | Case No. 22-11121 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: December 9, 2022 at 10:30 a.m. (ET)** |
| | ) | **Objection Deadline: December 2, 2022 at 4:00 p.m. (ET)** |

### DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' TEXAS ASSETS, (B) AUTHORIZING THE DEBTORS TO DESIGNATE A STALKING HORSE BIDDER AND TO SEEK APPROVAL OF BID PROTECTIONS, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors")[2] hereby file this

motion (the "Motion") for the entry of (a) an order, substantially in the form attached hereto as

**Exhibit A** (the "Bidding Procedures Order"), (i) approving bidding procedures, substantially in

the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures"), to be

used in connection with the sale (the "Sale") of all, substantially all, or portion of the Debtors'

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits (if any) of each Debtor's federal tax identification number include: Taronis Fuels, Inc. (7454), MagneGas Welding Supply – West, LLC (6662), Taronis Sub III LLC (5826), MagneGas Welding Supply – South, LLC (8686), MagneGas Real Estate Holdings, LLC (7412), MagneGas IP, LLC (0988), MagneGas Production, LLC (7727), Taronis Sub I LLC (4205), Taronis-TAS, LLC (2356), Taronis-TAH, LLC (3542), and Taronis Sub II LLC (9673).  The location of the Debtors' service address in these chapter 11 cases is 24980 N. 83rd Avenue, Suite 100, Peoria, Arizona 85383.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

assets related to the operation of their Texas retail business (the "Assets"), (ii) authorizing the Debtors to designate a Stalking Horse Bidder (as defined herein) and seek approval of Bid Protections (as defined herein) in accordance with the Stalking Horse Designation Procedures (as defined herein), (iii) scheduling an auction of the Assets (the "Auction"), if any, and scheduling the hearing to approve a sale of the Assets (the "Sale Hearing"), (iv) approving the form and manner of notice of the proposed Bidding Procedures, the Stalking Horse Designation Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice"), (v) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts") in connection with any Sale (the "Assumption and Assignment Procedures"), (vi) approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "Counterparty") of (A) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Costs") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice"), and (vii) granting related relief; and (b) an order (the "Sale Order"),[3] (i) authorizing the sale of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain assumed liabilities and permitted encumbrances as determined by the Debtors and the Successful Bidder (as defined herein), with liens to attach to the proceeds of the Sale, (ii) authorizing the assumption and assignment of certain Contracts in connection with the Sale, and (iii) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of R. Jered Ruyle in Support of the Chapter 11 Petitions and First Day Pleadings* (the "First Day

---

[3]      A copy of the Sale Order will be filed on or before December 16, 2022.

Declaration"). In further support of this Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 6004-1 and 9006-1.

## BACKGROUND

3.      On November 11, 2022 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No official committees have been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or examiner.

3

6.      The Debtors manufacture and distribute industrial, medical, specialty and beverage gases and associated welding and safety supplies.  Currently, the Debtors operate fifteen (15) retail locations, three (3) gas fill plants, and have approximately ninety-two (92) employees, serving retail customers in four (4) states.  The Debtors supply their customers with products ranging from bulk quantities of cryogenic gases to individual packaged cylinders.  The Debtors have the capacity and expertise to supply large, bulk cryogenic gas customers as well as small one-man businesses.

7.      A detailed description of the Debtors, including their business operations, their corporate and capital structure, the events leading to the commencement of these Chapter 11 Cases, and the facts and circumstances supporting this Motion, are set forth in greater detail in the First Day Declaration and incorporated by reference herein.

## NEED FOR A TIMELY PROCESS

8.      As set forth in the First Day Declaration, given their liquidity position, the Debtors determined the best course to maximize value for their estates would be to commence the Chapter 11 Case and seek sales of their remaining assets.  On November 18, 2022, the Debtors' Board of Directors interviewed several investment banker candidates and intends to select one to serve as the Debtors' investment banker (the "Investment Banker") in the coming days.[4]

9.      The Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase all, substantially all, or portion of the Assets.

---

[4]      Once the Investment Banker is selected, the Debtors and their professionals intend to consult with the Investment Banker regarding the process and timeline and reserve the right to modify the Bid Procedures prior to the hearing on this Motion consistent with their fiduciary duties to the extent their Investment Banker suggests modifications that the Debtors, in consultation with their advisors, believe will aid in maximizing value for their estates.

ACTIVE/118827260.1

10.     As is true in many cases, speed and certainty are critical here.  Simply put, the Debtors' current financial condition will not allow for an unlimited postpetition sale process.  As set forth in further detail in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Expense Status, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief and (B) Scheduling a Final Hearing* [Docket No. 13] (the "DIP Motion"), filed on the Petition Date, the Debtors have negotiated with Tech Capital, LLC ("Lender") as their Prepetition Lender and DIP Lender (each as defined in the DIP Motion) for debtor in possession financing and the consensual use of cash collateral pursuant to the DIP Loan Agreement and Budget (as such terms are defined in the DIP Motion) and the Debtors' ability to use the debtor in possession financing and cash collateral is conditioned upon adherence to strict sale milestones.[5]  Those milestones include, among other things, entry of a sale order by January 13, 2023, and closing of the sale by January 20, 2023 and immediate disbursement of sale proceeds to Lender in accordance with the DIP Loan Agreement.  In short, the Debtors' liquidity position dictates that the sale be consummated on an expedited basis—specifically, that it must close on or before January 20, 2023—as the Debtors do not have liquidity or financing to operate their business beyond that date.

11.     Most importantly, however, is that the Debtors believe the proposed timeline is reasonable and that the Debtors can run a robust sale process that encourages bidder participation.  The most likely bidders are within the Debtors' industry.  As such, the Debtors believe that many,

---

[5]     The DIP Motion has been approved on an interim basis pursuant to the Interim Order *(I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Expense Status, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* (the "Interim DIP Order") [Docket No. 37] entered on November 16, 2022.  The Interim DIP Order together with the anticipated final order (to entered after the December 9, 2022 hearing) and other applicable financing orders shall be referred to collectively, as the "DIP Order."

if not all, prospective bidders are already intimately familiar with the nature of the Debtors' business and, in the timeline proposed herein, will have sufficient time, familiarity with the industry and information to conduct the necessary due diligence to submit binding bids.

12.     For the foregoing reasons, the Debtors believe that the proposed sale process with the goal of achieving a value maximizing sale transaction is in the best interests of the Debtors and all stakeholders.  Thus, the Debtors have determined that pursuing the Sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates.

## STALKING HORSE DESIGNATION PROCEDURES

13.     As part of their Bidding Procedures, the Debtors seek authority, subject to the terms of the Bidding Procedures Order, to designate a stalking horse bid (the "Stalking Horse Bid"), pursuant to the procedures set forth in section IV of the Bidding Procedures (the "Stalking Horse Designation Procedures") for any or all of the Debtors' Assets and, in consultation with the Consultation Parties and subject to the express consent of the Lender, to enter into a purchase agreement (the "Stalking Horse Agreement") with a potential bidder (the "Stalking Horse Bidder"), upon consultation with (i) the Lender and (ii) any official committee appointed in these Chapter 11 Cases (the "Committee" and together with the Lender, the "Consultation Parties"). Debtors propose to designate any Stalking Horse Bidder and enter into any Stalking Horse Agreement **no later than December 21, 2022, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended by the Debtors (after consultation with the Consultation Parties).

14.     The Debtors believe that the ability to enter into a Stalking Horse Agreement with a potential buyer is critical in driving value for the Debtors' estates, as a Stalking Horse will set the baseline bid in what the Debtors anticipate will be a robust auction process.  Consistent with

6

the market for this kind of process, the Debtors anticipate that it may be necessary to afford a Stalking Horse Bidder certain protections to induce the Stalking Horse Bidder to provide a substantial bid and firm commitment to the Sale.

15.     Pursuant to the Bidding Procedures, upon the designation of a Stalking Horse Bidder, the Debtors are hereby requesting authority to, in consultation with the Consultation Parties, to seek approval of an award to a Stalking Horse Bidder with incentives in the form of a break-up fee and reimbursement of documented, actual, and necessary expenses incurred by the Stalking Horse Bidder, in connection with submitting its Stalking Horse Bid (collectively, the "Bid Protections").   Those Bid Protections will be described with specificity in a motion seeking approval of such Bid Protections (the "Stalking Horse Motion").   The Debtors request that the Court schedule a hearing on or about December 28, 2022 (the "Stalking Horse Hearing") to consider the Stalking Horse Motion and any Bid Protections.  All parties-in-interest shall have the right at the Stalking Horse Hearing to object to the Debtors' entry into a Stalking Horse Agreement on any grounds, including objections to the Bid Protections and the form of Stalking Horse Order, in whole or in part.  If the Court enters an order approving the Stalking Horse Motion (the "Stalking Horse Order"), the Debtors will provide notice of entry of the Stalking Horse Order on the Sale Notice Parties (as defined in section X.B of the Bidding Procedures) and any Prospective Bidder (as defined in section III of the Bidding Procedures).

## OVERVIEW OF BIDDING PROCEDURES, NOTICE PROCEDURES AND ASSIGNMENT PROCEDURES

**A.    Bidding Procedures.**

16.     The Bidding Procedures are intended to facilitate a competitive marketing and sale process, including identifying the highest or best offer or offers for the Assets.  The Sale may be

ACTIVE/118827260.1

for all of the Assets or for a portion thereof, to one or more purchasers as potential purchasers may

direct and based on the highest or best return for the Debtors' estates.

17.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are

not restated in their entirety herein.  Pursuant to Local Rule 6004-1, certain of the key terms of the

Bidding Procedures are highlighted in the chart below.[6]

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | **Due Diligence, Qualified Bid and Qualified Bidder Requirements are set forth in Sections III, V, and VI of the Bidding Procedures.**<br><br>**A.  Due Diligence**<br><br>1.  Each person or entity that desires to participate in the Auction process must first deliver to the Investment Banker (contact information in Sections I and III of the Bidding Procedures) the following:<br><br>• documentation identifying the Prospective Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale;<br><br>• an executed confidentiality agreement, in form and substance satisfactory to the Debtors;<br><br>• a statement and other factual support demonstrating to the Debtors and their advisors, in their sole judgment, that the Prospective Bidder has a bona fide interest in purchasing some or all of the Assets; and<br><br>• preliminary proof by the Prospective Bidder of its financial capacity to close a proposed sale transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Prospective Bidder (or, if the Prospective Bidder is an entity formed for the purpose of acquiring the Assets to be sold, the party that will bear liability for a breach by the Prospective Bidder of an asset purchase agreement or other agreement entered into in respect of the sale transaction), the adequacy of which the Debtors and their advisors will determine in their sole judgment.<br><br>Without the need for any further action, any Stalking Horse Bidder is a Prospective Bidder and a Qualified Bidder.<br><br>Upon execution of a valid confidentiality agreement and subject to the other limitations and guidelines set forth herein, the Debtors may grant a Prospective Bidder that the Debtors identify as reasonably likely to become a Qualified Bidder with access to information allowing |

---

[6]    Any conflict between the summary of Bidding Procedures set forth in this Motion and the Bidding Procedures, the Bidding Procedures as approved by the Court shall govern in all respects.  Capitalized terms used but not defined in this section shall have the meanings ascribed in the Bidding Procedures.

ACTIVE/118827260.1

such Prospective Bidder to conduct due diligence with respect to the potential acquisition of some or all of the Assets. If any Prospective Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Prospective Bidder any trade secrets or proprietary information (as determined by the Debtors in their sole discretion), unless the confidentiality agreement executed by such Prospective Bidder is satisfactory to the Debtors and contains provisions sufficient to ensure that such Prospective Bidder will not use such trade secrets or proprietary information for an improper purpose or to gain an unfair competitive advantage.

If the Debtors determine, after consulting with the Consultation Parties, that a Prospective Bidder is unlikely to qualify as a Qualified Bidder or fails to become a Qualified Bidder, then such Prospective Bidder shall have no further right to access due diligence or any other non-public information.  The Prospective Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Prospective Bidder in accordance with the terms of the confidentiality agreement executed by the Debtors and the Prospective Bidder.

All due diligence requests shall be directed to the Debtors' Investment Banker.

**B.  Bid Deadline** - Submit Qualified Bid by **January 3, 2023, at 4:00 p.m. (prevailing Eastern Time)**.

**C.  Qualified Bid Requirements**

1.  <u>Identification of Bidder</u>. A Qualified Bid must fully disclose the legal identity of the bidder and any related parties participating in the bidding and Auction process.

2.  <u>Purchase Price</u>. A Qualified Bid must (a) identify the Assets to be purchased, including any then-known Contracts that are proposed to be assumed and assigned to the bidder and any liabilities to be assumed and (b) set forth the purchase price of the bid.

3.  <u>Form of Consideration</u>.

    - *Credit Bidding*.   The Lender may, subject to the terms of the DIP Order, credit bid the outstanding Prepetition Obligations or the DIP Obligations (as defined in the DIP Order) (the "<u>Credit Bid</u>").  Any Credit Bid shall be deemed to be a Qualified Bid without the need to provide any Deposit, and the Lender shall be deemed a Qualified Bidder in connection with such credit bid.  No other party may Credit Bid.

    - *Consideration*.  Each other bid must include a statement confirming that the bid is based on an all-cash offer, or if a bid includes forms of consideration other than cash, the bidder shall include an analysis or description of the value of such non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in evaluating the bid.

4.  <u>Minimum Bid for Assets</u>.  If a Stalking Horse Bidder has been designated, each bid that is not a Stalking Horse Bid must have a value to the Debtors, as determined by the Debtors, in consultation with the Consultation Parties, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, <u>plus</u> (a) the amount of the Bid Protections and (b) $250,000 (collectively, the "<u>Minimum Bid Amount</u>").

    If the value of a bid relative to any Stalking Horse Bid includes additional non-cash components (such as fewer contingencies than are in such Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional

9

non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in better evaluating the competing bid.

If a Stalking Horse Bidder is not designated pursuant to the Stalking Horse Designation Procedures, the Debtors, in consultation with the Lender, may set a minimum bid requirement, which shall be considered the Minimum Bid Amount for all purposes hereunder. In such case, the Debtors will file a notice on the docket identifying the Minimum Bid Amount **no later than December 28, 2022 at 4:00 p.m. (prevailing Eastern Time)** and shall serve such notice on any known potential bidder.

5. <u>Proposed Asset Purchase Agreement</u>. A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (each, a "<u>Proposed Asset Purchase Agreement</u>"). A Proposed Asset Purchase Agreement shall be (a) duly authorized and executed; (b) based on, and marked against, the form asset purchase agreement to be filed with the Court no later than December 2, 2022 (the "<u>Form APA</u>") or, if a Stalking Horse Bidder has been designated, the Stalking Horse Agreement, to reflect the proposed sale transaction and to show any other proposed modifications to the Form APA or Stalking Horse Agreement, as applicable; (c) specify the proposed purchase price for the Assets in U.S. dollars; (d) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that, by their nature, must be prepared by the Debtors); and (e) identify any Contracts that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed sale transaction.

6. <u>Proposed Sale Order</u>. A Qualified Bid must include a proposed sale order (each, a "<u>Proposed Sale Order</u>") and be marked against the proposed Sale Order, which the Debtors will file with the Court on or before December 16, 2022.

7. <u>Financial Information</u>. A Qualified Bid must include (a) a statement that the Prospective Bidder is financially capable of consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; (b) sufficient evidence, as determined by the Debtors in their sole discretion, to determine that the Prospective Bidder has, or will obtain, the financial wherewithal to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; and (c) Adequate Assurance Information (as defined below) with respect to any Contracts included or that may be included in the Prospective Bidder's bid, including the identity of any known proposed assignee of the applicable Contracts (if different from the Prospective Bidder), including contact information for such proposed assignee.

8. <u>Good Faith Deposit</u>. Each Qualified Bid must be accompanied by a good faith deposit (each, a "<u>Good Faith Deposit</u>") in the form of cash in an amount equal to 10% of the proposed purchase price for the Assets. The Good Faith Deposit shall be deposited **no later than January 3, 2023 at 3:00 pm (prevailing Eastern Time)** with an escrow agent selected by the Debtors.

9. <u>Adequate Assurance</u>. A Qualified Bid must include evidence of the Prospective Bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid. The Debtors may require (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased premises included in the bid

ACTIVE/118827260.1

(collectively, the "Adequate Assurance Information"). Adequate Assurance Information must be in a form that will permit its immediate dissemination to Contract counterparties ("Counterparties").

10. Representations and Warranties (As-Is, Where-Is). Each Qualified Bid must include a written acknowledgement and representation that the Prospective Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Qualified Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making its Qualified Bid, (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Prospective Bidder's  Proposed Asset Purchase Agreement and (d) the Assets will be conveyed "as is, where is, with all faults," with limited representations and warranties, and no indemnification or guarantees by the Debtors.

11. Authorization. A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution and delivery of a bid, participation in the Auction and closing the proposed Sale.

12. Other Requirements. A Qualified Bid must also satisfy, among others (as set forth in Section VI.A.12 of the Bidding Procedures), the following requirements:

- state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined below) for the applicable Assets (each such bid, a "Backup Bid");
- state that the bid represents a binding, good-faith and *bona fide* offer to purchase the applicable Assets and is irrevocable (a) until the selection of the Successful Bid; or, (b) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date (as defined below);
- for any bidder other than the Stalking Horse Bidder, state and acknowledge that the Prospective Bidder shall not be entitled to any bidding protection or payment in connection with the submission of a bid for the Assets or otherwise participating in the Sale Process;
- state that the Prospective Bidder is committed to closing the Sale contemplated in its bid as soon as practicable (and in no event later than January 20, 2023);
- expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Process;
- not contain any financing contingencies of any kind;
- state whether the Prospective Bidder intends to offer future employment to any of the Debtors' employees and, if so, to whom;
- certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtors;
- include a covenant to comply with the terms of the Bidding Procedures and the Bidding Procedures Order; and
- contain such other information as may be reasonably requested by the Debtors.

ACTIVE/118827260.1

| | |
|---|---|
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | Section VI.A.8. of the proposed Bidding Procedures requires each Qualified Bidder to submit a cash deposit equal to 10% of its bid. |
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | The Lender may credit bid all or any portion of the outstanding Prepetition Obligations or the DIP Obligations (as defined in the DIP Order) (the "<u>Credit Bid</u>"), subject to the provisions of the DIP Order. Any Credit Bid shall be a Qualified Bid without the need to provide any Deposit, and Lender shall be a Qualified Bidder in connection with such Credit Bid. No other party may credit bid. Bid Procedures § VI.A.iii.a. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | This Motion seeks, and the proposed Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). *See* Bidding Procedures Order ¶ 40. |
| **Provisions Providing Bid Protections to Stalking Horse or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | Subject to the provisions set forth in the Bidding Procedures, the Bidding Procedures Order, and in consultation with the Consultation Parties, Debtors may designate a Stalking Horse Bidder that submits a Qualified Bid acceptable to the Debtors and file a Stalking Horse Motion seeking approval to enter into a Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, **no later than December 21, 2022, at 4:00 p.m.** (prevailing Eastern Time), which deadline may be extended by the Debtors (after consultation with the Consultation Parties).<br><br>The Debtors, in consultation with the Consultation Parties, may seek approval of Bid Protections to the Stalking Horse: (i) break-up fees and (ii) reimbursement of expenses, if any, for documented, actual and necessary expenses incurred by any Stalking Horse Bidder (collectively, the "<u>Bid Protections</u>").<br><br>Those Bid Protections will be described with specificity in a motion seeking approval of such Bid Protections (the "Stalking Horse Motion"). The Debtors request that the Court schedule a hearing on or about December 28, 2022 (the "<u>Stalking Horse Hearing</u>") to consider the Stalking Horse Motion and any Bid Protections. All parties-in-interest shall have the right at the Stalking Horse Hearing to object to the Debtors' entry into a Stalking Horse Agreement on any grounds, including objections to the Bid Protections and the form of Stalking Horse Order, in whole or in part. If the Court enters an order approving the Stalking Horse Motion (the "<u>Stalking Horse Order</u>"), the Debtors will provide notice of entry of the Stalking Horse Order on the Sale Notice Parties and any Prospective Bidder. |
| **Modification of Bidding Procedures**<br>Local Rule 6004-1(c)(i)(D) | Section IX of the Bidding Procedures sets forth the Debtors' reservation of rights to, in their reasonable business judgment and after consultation with the Consultation Parties, and in a manner consistent with their fiduciary duties and applicable law, (i) modify these Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein, adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders, as applicable, or (ii) otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the of the value of the Assets, in each case, to the extent not materially inconsistent with these Bidding Procedures or the Bidding Procedures Order. |

ACTIVE/118827260.1

| | |
|---|---|
| **Closing with Alternative Back-up Bidders**<br>Local Rule 6004-1(c)(i)(E) | Section VII.C.2 of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids.<br><br>Immediately prior to the conclusion of the Auction, the Debtors will (a) determine which Qualified Bid is the Backup Bid for the applicable Assets and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the material terms of the Backup Bid.<br><br>Except as otherwise provided in any Stalking Horse Agreement, a Backup Bid will remain binding on the Backup Bidder until the later of (a) the first business day after the closing of a Sale with the Successful Bidder for the applicable Assets and (b) 30 days after the Sale Hearing (such date, the "<u>Backup Bid Expiration Date</u>"). If the Sale with the Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder will be deemed the new Successful Bidder for the applicable Assets and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; *provided* that the Debtors may, in their reasonable business judgment (after providing notice to the Sale Notice Parties) and after consultation with the Consultation Parties, elect not to pursue the sale transaction contemplated by the Backup Bid. |
| **Provisions Governing the Auction**<br>Local Rule 6004-1(c)(ii) | Section VII.B of the Bidding Procedures sets forth the procedures governing the Auction.<br><br>If the Debtors receive more than one Qualified Bid for the Assets, the Debtors will conduct an Auction for the Assets. If any Stalking Horse Bid is the only Qualified Bid received in respect of the Assets, the Debtors will not conduct an Auction for the Assets and will seek approval of such Stalking Horse Bid at the Sale Hearing. If the Debtors determine not to hold an Auction for some or all of the Assets, the Debtors will file and serve a notice stating that the Auction for such Assets has been canceled and providing all other relevant information to the Sale Notice Parties as required by the Bidding Procedures.<br><br>The Auction, if required, will be conducted on **January 6, 2023, at 10:00 a.m.** (prevailing Eastern Time), at either (i) at the offices of Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, Delaware 19801, or (ii) virtually or at such other date, time or location as designated by the Debtors, after consulting with the Consultation Parties. If the Debtors conduct the Auction virtually, the Debtors will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail. The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders and the Consultation Parties and will cause publication of such change to occur on the Claims' Agent Website (as defined in the Bidding Procedures Order).<br><br>A. <u>Participation</u>. Each participant in the Auction must be (i) a Qualified Bidder, (ii) appear at the Auction, either personally or through a duly authorized representative and (iii) confirm on the record that (A) the participant has not engaged in any collusion with respect to any bid or the Sale Process and (B) any and all Qualified Bids submitted by the participant constitute good faith, binding and *bona fide* offers to purchase the applicable Assets.<br><br>B. <u>Proceedings</u>. The Auction proceedings will (i) be transcribed and/or video recorded and (ii) include open bidding in the presence of all Qualified Bidders, subject to reasonable limitations imposed by a virtual auction platform to be evaluated and determined by the Debtors.<br><br>C. <u>Baseline Bids</u>.  Prior to the commencement of the Auction, the Debtors will determine, in their reasonable business judgment (and in consultation with the Consultation Parties) the highest and/or best Qualified Bid submitted for the Assets (such Qualified Bid, a "Baseline Bid").  Bidding at the Auction shall commence at the amount of the Baseline Bid.  **No later than January 5, 2023 at 4:00 p.m.** (prevailing Eastern Time), the Debtors will provide all |

ACTIVE/118827260.1

Qualified Bidders with (a) a notice identifying all the Qualified Bidders and which Qualified Bid is the Baseline Bid; and (b) a copy of the Baseline Bid.

D. <u>Minimum Overbids</u>.  Bidding shall commence at the Baseline Bid.  The first overbid at the Auction shall be in an amount not less than the amount of the Baseline Bid <u>plus</u> $250,000 (the "<u>Minimum Overbid</u>").  At each round of bidding, Qualified Bidders may submit successive bids higher than the Leading Bid (as defined below) from the prior round. During the Auction, the Debtors may, in their reasonable discretion, announce increases or reductions to Minimum Overbids at any time.

Except as specifically set forth in the Bidding Procedures, for the purpose of evaluating the value of the consideration provided by any bid subsequent to the Baseline Bid, the Debtors will, at each round of bidding, consider and/or give effect to (a) any Bid Protections payable to any Stalking Horse Bidder under the Stalking Horse Agreement; (b) any additional liabilities to be assumed by a Qualified Bidder under the bid, including whether such liabilities are secured or unsecured; and (c) any additional costs that may be imposed on the Debtors.

E. <u>Leading Bids</u>. After the first round of bidding and between each subsequent round of bidding, the Debtors will announce the bid that they believe to be the highest or otherwise best offer for the Assets (each such bid, a "<u>Leading Bid</u>") and describe the material terms thereof.

F. <u>Successful Bids</u>. Immediately prior to the conclusion of the Auction, the Debtors will (i) determine in consultation with the Consultation Parties, which Qualified Bid constitutes the highest or otherwise best bid for the Assets (such bid, a "<u>Successful Bid</u>") and (ii) notify all Qualified Bidders at the Auction of the identity of the bidder that submitted the Successful Bid for the Assets (each such bidder, a "<u>Successful Bidder</u>") and the material terms of the Successful Bid.

## B.  Key Dates and Deadlines.

18.  The Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:[7]

| **Two business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice |
|---|---|
| **Two business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Assumption and Assignment Notice |
| **December 21, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement |
| **December 28, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Sale Objection Deadline and Cure Objection Deadline |

[7]  The Debtors reserve the right to change the proposed sale-related deadlines at any time prior to the Bidding Procedures Hearing; *provided*, *however*, that any modified dates shall not provide parties with any lesser notice or time than the dates set forth in the entered Bidding Procedures Order.

ACTIVE/118827260.1

| January 3, 2023, at 4:00 p.m. (prevailing Eastern Time) | Bid Deadline |
|---|---|
| January 6, 2023, at 10:00 a.m. (prevailing Eastern Time) | Auction |
| One business day after the conclusion of the Auction | Deadline for Debtors to file and serve Notice of Auction Results |
| January 10, 2023, at 4:00 p.m. (prevailing Eastern Time) | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |
| January 12, 2023, at 12:00 p.m. (prevailing Eastern Time) | Debtors' Deadline to Reply to any Sale Objections or Supplemental Sale Objections |
| January 13, 2023, subject to the availability of the Court | Sale Hearing |
| January 20, 2023 | Deadline to consummate approved Sale |

**C.**    **Sale Noticing and Objection Procedures**

19.    The Bidding Procedures provide the following "Noticing Procedures":

a.    **Stalking Horse Order**.  As soon as practicable after the Debtors file the Stalking Horse Motion with the Court, the Debtors will cause a copy of the Stalking Horse Motion to be served on the Sale Notice Parties and any Prospective Bidder.  Any Stalking Horse Order that is entered by the Court shall also be served on the Sale Notice Parties and any Prospective Bidder as soon as practicable after entry by the Court.

b.    **Sale Notice.** Within two (2) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve on the Sale Notice Parties and cause to be published on the Claims' Agent Website the Sale Notice.

c.    **Sale Objection**.  Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder, objections to the sale of the Assets, including (i) any objection to a sale of Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order must be (A) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (B) filed with the Court by **no later than December 28, 2022, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"); and (C) served on the Objection Notice Parties (as defined in the Bidding Procedures).

d.    **Notice of Determination of Qualified Bids**. The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as Qualified Bids and will notify Potential Bidders whether they have been selected as Qualified Bidders by **no later than January 5, 2023, at 10:00 a.m. (prevailing Eastern Time)**.

i. **No later than January 5, 2023, at 5:00 p.m. (prevailing Eastern Time)**, the Debtors will provide all Qualified Bidders (including the Stalking Horse Bidder, if any) copies of the Qualified Bid that the Debtors, after consultation with the Consultation Parties, believe is the highest or otherwise best offer for the Assets (the "<u>Baseline Bid</u>").

e. **<u>Auction Results</u>.** One business day after the conclusion of the Auction, the Debtors will file with the Court, serve on the Sale Notice Parties and cause to be published on the Claims' Agent Website, a notice of the results of the Auction (the "<u>Notice of Auction Results</u>"), which will (A) identify the Successful Bidder and the Backup Bidder; (B) either include a copy of each Successful Bid and the Backup Bid or a summary of the material terms of such bids, or provide instructions for accessing each Successful Bid and the Backup Bid free of charge from the Claims' Agent Website; and (C) set forth the Supplemental Sale Objection Deadline and the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

f. **<u>Supplemental Sale Objections</u>.** Following service of the Notice of Auction Results, Sale Notice Parties will have an opportunity to object solely with respect to the conduct of the Auction, the Successful Bidder, the Backup Bidder, or the Sale to the Successful Bidder or the Backup Bidder (each such objection, a "<u>Supplemental Sale Objection</u>"). Any Supplemental Objection must be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) filed with the Court by **no later than January 10, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Supplemental Sale Objection Deadline</u>"); and (iii) served on the Objection Notice Parties.

20. The Debtors believe that the Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, the dates and deadlines identified in paragraph 18 above. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**D.     Assumption and Assignment Procedures**

21. In connection with the Sale, the Debtors likely will seek to assume and assign to the Successful Bidder (or its designated assignee(s)) one or more Contracts. The Assumption and

ACTIVE/118827260.1

Assignment Procedures are designed to, among other things, govern the Debtors' provision of Adequate Assurance Information and notice of Cure Costs to applicable Counterparties.[8]

22.     Accordingly, the Debtors hereby seek approval of the proposed Assumption and Assignment Procedures set forth below, which are designed to, among other things, (i) outline the process by which the Debtors will serve notice to all Counterparties regarding the proposed assumption and assignment, related Cure Costs, if any, and information regarding the Stalking Horse Bidder's or such other Successful Bidder's adequate assurance of future performance and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of executory contacts and unexpired leases.   Specifically, the Assumption and Assignment Procedures are as follows:

a.     **Potential Assumption and Assignment Notice**.  Two business days after the entry of the Bidding Procedures Order, the Debtors will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale an Assumption and Assignment Notice, which will (i) identify the applicable Contracts; (ii) list the Debtors' good-faith calculation of Cure Costs with respect to each such Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval; and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). The Assumption and Assignment Notice shall also be served on each Counterparty listed therein via first class mail.

b.     **Assumption and Assignment Objections**.

i.     <u>Cure Objection Deadline</u>. Any Counterparty to a Contract that wishes to object to the Debtors' proposed Cure Costs (each such objection, a "<u>Cure Objection</u>") shall file with the Court and serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by **no later than December 28, 2022, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Cure Objection Deadline</u>").

---

[8]     For avoidance of doubt, all Cure Costs to applicable Counterparties shall be satisfied by the Successful Bidder (its designee).

ACTIVE/118827260.1

ii.     Resolution of Cure Objections. The Debtors, any Stalking Horse Bidder or Successful Bidder, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.  If a Cure Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the Sale, the Debtors, any Stalking Horse Bidder or, as applicable, the Successful Bidder may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the Sale (subject to the terms of the Sale). All other objections to the proposed assumption and assignment of the Debtors' right, title and interest in, to and under a Contract will be heard at the Sale Hearing.

iii.    Adjournment.  If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing, or, at the Debtors' option, be adjourned to a subsequent hearing, with notice to the party having filed the Cure Objection (each such Cure Objection, an "Adjourned Cure Objection").  An Adjourned Cure Objection may be resolved after the closing date of the Sale.  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Cure Objection shall, as applicable, be deemed assumed and assigned to the Successful Bidder as of the closing date of the Sale.

iv.     Failure to Timely Object. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract. The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs.

v.      Adequate Assurance Objection Deadline. Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance (each such objection, an "Adequate Assurance Objection"), shall file with the

ACTIVE/118827260.1

Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, **by January 10, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the " Adequate Assurance Objection Deadline" and, together with the Cure Objection Deadline, the Sale Objection Deadline and the Supplemental Sale Objection Deadline, the "Objection Deadlines").

vi.    Resolution of Adequate Assurance Objections. The Debtors and the objecting Counterparty shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing or, at the option of the Debtors and the Successful Bidder, be adjourned to a subsequent hearing, with notice to the party having filed the Adequate Assurance Objection.

vii.    Failure to Timely Object. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance. The Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document.

c.    **Notice of Assumed Contracts**. As soon as reasonably practicable after the closing of the Sale, the Debtors will file with the Court, serve on the applicable Counterparties and cause to be published on the Claims' Agent Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to the asset purchase agreement with the Successful Bidder.

d.    **Reservation of Rights**. The inclusion of a Contract or specification of any Cure Costs with respect to any Contract on any Assumption and Assignment Notice or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned.

ACTIVE/118827260.1

The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on the aforementioned notices.

### **RELIEF REQUESTED**

23.     By this Motion, pursuant to sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors request entry of the following:

a.    the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A,** granting the following relief:

(i)    approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, to be used in connection with one or more Sale of all, substantially all, or portion of the Debtors' Assets;

(ii)    authorizing the Debtors to designate a Stalking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures;

(iii)    scheduling (A) the Auction of the Assets **no later than January 6, 2023, at 10:00 a.m. (prevailing Eastern Time)** and (B) the Sale Hearing to consider approval of the proposed Sale **no later than January 13, 2023,** subject to the availability of the Court;

(iv)    approving the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**;

(v)    approving the Assumption and Assignment Procedures;

(vi)    approving the Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**; and

(vii)    granting related relief; and

b.    a Sale Order, granting the following relief:

(i)    authorizing the sale of the Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtors and the Successful Bidder, with liens to attach to the proceeds of the Sale and prompt disbursement of such proceeds to Lender in accordance with the DIP Loan Agreement;

20

     (ii)     authorizing the assumption and assignment of certain Contracts in connection with a Sale; and

     (iii)    granting related relief.

## APPROVAL OF THE RELIEF REQUESTED IS WARRANTED AND IN THE BEST INTERESTS OF THE DEBTORS AND THEIR STAKEHOLDERS

**A.     The Proposed Bidding Procedures Are Fair, Appropriate and Should Be Approved**

24.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate:  maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

25.     The Bidding Procedures provide for an orderly and appropriately competitive process through which interested parties may submit offers to purchase the Assets.  Given the Debtors' liquidity constraints, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets.  Additionally, the Bidding Procedures

will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtors, their estates and all parties-in-interest.

26.    Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures. *See, e.g.*, *In re Enjoy Tech., Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. Jul. 26, 2022) (sale hearing held 43 days after the petition date); *In re Gold Standard Baking, LLC*, Case No. 22-10559 (JKS) (Bankr. D. Del. Jul. 8, 2022) (sale hearing held 42 days after the petition date); *In re Makeup Liquidating Holdings, LLC*, Case No. 22-10050 (CSS) (Bankr. D. Del. Jan. 28, 2022) (sale hearing held 35 days after the petition date); *In re BBGI US, Inc.*, Case No. 20-11785 (BLS) (Bankr. D. Del. Aug. 3, 2020) (sale hearing held 37 days after the petition date); *In re CR Holding Liquidating, Inc.*, Case No. 19-10210 (LSS) (Bankr. D. Del. Feb. 21, 2019) (sale hearing held 31 days after the petition date); *In re Lucky Brand Dungarees, LLC*, Case No 20-11768 (CSS) (Bankr. D. Del July 30, 2020) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 8 days after entry of bidding procedures order and sale hearing 40 days after the petition date); *In re Templar Energy LLC*, Case No 20-11441 (BLS) (Bankr. D. Del. June 23, 2020) (approving bidding procedures with bid deadline 13 days after entry of bidding procedures order and sale hearing 43 days after the petition date); *In re Sustainable Restaurant Holdings, Inc.*, Case No 20-11087 (JTD) (Bankr. D. Del. June 19, 2020) (approving bidding procedures with bid deadline 19 days after entry of bidding procedures order and sale hearing 64 days after the petition date); *In re Golfsmith Int'l Holdings,*

*Inc.*, Case No 16-12033 (LSS) (Bankr. D. Del. Oct. 6, 2016) (approving bidding procedures with a bid deadline 11 days after entry of order and auction scheduled for 13 days after entry of order).[9]

**B.      The Proposed Bid Protections Have Sound Business Purposes and Should Be Approved.**

27.      As described above, the Bid Protections, if they prove necessary for the entry into any Stalking Horse Agreement, include break-up fees and reimbursement of reasonable, documented expenses.   The Debtors believe that the Bid Protections may be necessary to encourage prospective bidders to become the Stalking Horse Bidder and enter into a binding Stalking Horse Agreement.   The Debtors believe that the presence of a Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for the Assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors and all other parties-in-interest.

28.      Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.   Courts have identified at least two instances in which bid protections may benefit the estate.   *First*, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."   *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537.   *Second*, if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."   *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08

---

[9]      Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.   Copies of these orders are available upon request to the Debtors' proposed counsel.

(3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

29.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

    a.     the presence of self-dealing or manipulation in negotiating the break-up fee;

    b.     whether the fee hampers, rather than encourages, bidding;

    c.     the reasonableness of the break-up fee relative to the purchase price;

    d.     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

    e.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

    f.     the correlation of the fee to a maximum value of the debtor's estate;

    g.     the support of the principal secured creditors and creditors' committees of the break-up fee;

    h.     the benefits of the safeguards to the debtor's estate; and

    i.     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

30.     While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtors' estates because they may enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially

24

higher or otherwise better than any Stalking Horse Agreement—a clear benefit to the Debtors' estates. Further, a Stalking Horse Bidder may not agree to act as a "stalking horse" without the Bid Protections, given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction. Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose any downside protection that would be afforded by the existence of a Stalking Horse Bidder. The bid of a Stalking Horse Bidder would send a message to all potential bidders that the Assets are worth at least as much as any Stalking Horse Bid. Therefore, without the benefit of the bid of a Stalking Horse Bidder (*i.e.*, a bid providing the floor), the bids received at auction for the Assets could be substantially lower than any bid offered by a Stalking Horse Bidder.

31.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. at 659. The Debtors do not believe that the Bid Protections will stifle bidding. To the contrary, the Debtors believe that such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id.* at 662.

32.     Here, the bid of a Stalking Horse Bidder would serve all three functions. *First*, a Stalking Horse Bidder might not enter into a Stalking Horse Agreement without the Bid Protections. *Second*, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of any Stalking Horse Bidder. *Third*, the bid of the Stalking Horse Bidder could attract additional bidders because, among other things, additional bidders would be able to save considerable time and expense

because they could use many of the documents that a Stalking Horse Bidder may negotiate, including, among other things, any Stalking Horse Agreement and the schedules thereto, in making their bid. In sum, if all, substantially all, or portion of the Assets are sold to a Successful Bidder other than a Stalking Horse Bidder, the Sale likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

33.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. 'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible.'" *Id*. (citation omitted).

34.    Here, the Bidding Procedures would authorize the Debtors to file a Stalking Horse Motion and allow a hearing on an expedited basis to approve Bid Protections in an amount to be set forth in such Stalking Horse Motion.

**C.    Approval of a Sale of the Assets Is Warranted Under Section 363 of the Bankruptcy Code.**

35.    Ample authority exists for approval of the Sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v.*

*McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

36.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:   (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. at 656.

**1.      The Debtors Have Demonstrated a Sound Business Justification for the Sale of the Assets.**

37.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 148 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070-71; *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

38.     As set forth above, a strong business justification exists for the sale of all, substantially all, or portion of the Assets as described herein.  An orderly and expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.

ACTIVE/118827260.1

**2.      Noticing Procedures Are Reasonable and Appropriate.**

39.      Bankruptcy Rules 2002 and 6004 require the Debtors to notify creditors of the proposed sale, provide a description of the Assets and disclose the time and place of the Auction, the terms and conditions of any proposed Sale, and the Objection Deadlines.  *See* Fed. R. Bankr. P. 2002(a), 2002(c), 6004(a).  The Noticing Procedures described herein are reasonably calculated to provide all of the Debtors' known creditors and all other parties-in-interest with adequate and timely notice of, among other things, the proposed Sale, the Bidding Procedures, the Stalking Horse Designation Procedures, the Auction, and the Sale Hearing.  Accordingly, the Debtors request that the Court approve the Noticing Procedures described herein and in the Bidding Procedures Order.

**3.      The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Assets.**

40.      As set forth above, the Debtors believe that any Sale governed by the Bidding Procedures will yield a fair and reasonable price for the Assets.  The Bidding Procedures were designed to facilitate a competitive bidding process.

41.      The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire Sale Process. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties-in-interest.

42.      A Sale governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or best value for the Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties-in-interest in these Chapter 11 Cases.

4.     **The Bidding Procedures Ensure that the Sale Process Is Conducted in Good Faith and that the Ultimate Purchaser of the Applicable Assets Is Entitled to the Protections Afforded by Section 363(m) of the Bankruptcy Code.**

43.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies*, 788 F.2d at 147; *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

44.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

45.     In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession, the trustee or other bidders to demonstrate a lack of good faith.  *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269,

276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (quoting *In re Rock Indus. Mach. Corp.*, 572 F. 2d 1195, 1998 (7th Cir. 1978)).  Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

46.     The Debtors submit that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  As set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  In addition, the Investment Banker is an independent investment bank retained by the Debtors for the purpose of exploring strategic alternatives, marketing the Debtors' Texas retail business, soliciting bids, and negotiating the terms of a potential Sale.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Assets.  Any purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith by sophisticated parties represented by competent counsel. Accordingly, the Debtors seek a finding that any Successful Bidder (including any Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

47.     Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

ACTIVE/118827260.1

**D.**     **A Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code.**

48.     A free and clear sale is a pre-requisite to ensuring that the Debtors are able to attract the best and highest offers and achieve a value-maximizing transaction in these Chapter 11 Cases for the benefit of the Debtors and their stakeholders.

49.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

a.      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.      such entity consents;

c.      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.      such interest is in *bona fide* dispute; or

e.      such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same);

50.     The Debtors anticipate that any Sale they elect to pursue will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the applicable Assets.

51.     Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

ACTIVE/118827260.1

E.    **The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code.**

52.    Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease. *See, e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice). In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

53.    Any proposed Sale will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment. Assumption of any Contracts is an exercise of the Debtors' sound business judgment because the transfer of Contracts in connection with a Sale is an essential element in the Debtors' ability to maximize the value of the Assets— and particularly so when a Contract is integral to the ownership or operation of the Assets to be acquired. Further, the ability to assume and assign Contracts will increase the likelihood that the Debtors will be able to sell the Assets as a going concern, thereby avoiding needless value-destruction through a liquidation.

54.     The consummation of any Sale involving the assignment of a Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that the Debtors either cure, or provide adequate assurance that they will promptly cure, any outstanding defaults under the Contracts to be assumed. *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of a Sale.  As described with specificity herein, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Debtors' good-faith calculation of the Cure Costs for each Contract that could be assumed in connection with a Sale.  Counterparties will have an opportunity to raise any Cure Objections in advance of the Sale Hearing.

55.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract."  11 U.S.C. § 365(f)(2).  While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations").  While no single standard governs every case, adequate assurance "will fall considerably short of an absolute

ACTIVE/118827260.1

guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

56.     Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

57.     The Bidding Procedures expressly specify that for a bid to qualify as a "Qualified Bid," a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable obligations under any Contracts that may be included in the bid. The Debtors will furnish all available Adequate Assurance Information to the relevant Counterparties as soon as reasonably possible following their receipt of such information, upon such Counterparty's request.  Finally, any Counterparty that is dissatisfied with the content or quality of any relevant Adequate Assurance Information will have an opportunity to request additional information from the Debtors and, if necessary, lodge an Adequate Assurance Objection in advance of the Sale Hearing.  In light of the foregoing, the Debtors' assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

58.     Finally, to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Assets, the Debtors also request that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly prohibits, or has

34

the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[10]

### F.    Requests for Immediate Relief & Waiver of Stay.

59.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bidding Procedures Order, any Sale Order, any Stalking Horse Order, any order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale, and any other order entered by this Court in connection with the Sale. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

60.     The relief requested herein is necessary and appropriate to maximize the value of the Debtors' Assets for the benefit of the Debtors' economic stakeholders.  Given the Debtors' precarious financial condition and limited cash runway, the relief requested herein should be granted and effective as soon as practicable.  Any delay in the Sale Process could jeopardize the Debtors' chapter 11 strategy and the ability of the Debtors to consummate a value-maximizing transaction.  Accordingly, the Debtors submit that ample cause exists to justify waiving the

---

[10]        Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1). Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

ACTIVE/118827260.1

fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## NOTICE

61.     Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the United States Securities and Exchange Commission; (v) counsel to the Lender, Hemar, Rousso & Heald, LLP 15910 Ventura Blvd., 12th Floor, Encino, CA 91436 (Attn.: J. Alexandra Rhim and Jacqueline James); (vi) local counsel to the Lender, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: Allison S. Mielke); (vii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates on a consolidated basis; (viii) all persons and entities known by the Debtors to have expressed an interest in purchasing the Assets; (ix) all persons and entities known by the Debtors to have asserted any lien on or encumbrance with respect to the Assets (for whom identifying information and addresses are available to the Debtors); and (x) any other party entitled to notice pursuant to Bankruptcy Rule 2002 or order of the Court.  The Debtors respectfully submit that no further notice of this Motion need be provided.

## NO PRIOR REQUEST

62.     The Debtors have not previously sought the relief requested herein from the Court or any other court.

ACTIVE/118827260.1

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **<u>Exhibit A</u>**; (ii) and, after the Sale Hearing, the Sale Order, respectively, granting the relief requested in the Motion; and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: November 18, 2022      POTTER ANDERSON & CORROON LLP
       Wilmington, Delaware

*/s/ Katherine Good*
Jeremy W. Ryan (No. 4057)
L. Katherine Good (No. 5101)
R. Stephen McNeill (No. 5210)
Sameen Rizvi (No. 6902)
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Tel: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
      kgood@potteranderson.com
      rmcneill@potteranderson.com
      srizvi@potteranderson.com

*Proposed Counsel for Debtors and Debtors in Possession*

ACTIVE/118827260.1