# **EXHIBIT B**

## **CA APA**

**Execution Version**

# ASSET PURCHASE AGREEMENT

## by and among

## AIRGAS USA, LLC

### and

## MAGNEGAS WELDING SUPPLY – WEST, LLC

## MAGNEGAS REAL ESTATE HOLDINGS, LLC

### and

## TARONIS FUELS, INC.

## TABLE OF CONTENTS

ARTICLE I - DEFINITIONS.................................................................................1

    Section 1.01   Certain Definitions.....................................................................1

ARTICLE II - PURCHASE AND SALE OF ASSETS........................................10

    Section 2.01   Assets Purchased. ....................................................................10

    Section 2.02   Excluded Assets.......................................................................11

    Section 2.03   Assumed Liabilities. ................................................................12

    Section 2.04   Liabilities Not Assumed..........................................................12

ARTICLE III - PURCHASE PRICE; CLOSING................................................12

    Section 3.01   Purchase Price. ........................................................................12

    Section 3.02   Reserved. .................................................................................12

    Section 3.03   Purchase Price Allocation. ......................................................12

    Section 3.04   Payment of Purchase Price......................................................12

ARTICLE IV - REPRESENTATIONS OF SELLERS AND PARENT ................13

    Section 4.01   Organization and Good Standing. ...........................................13

    Section 4.02   No Violation; No Consents. .....................................................13

    Section 4.03   Validity of Agreement. ............................................................14

    Section 4.04   Ownership. ...............................................................................14

    Section 4.05   Assets; Real Property...............................................................14

    Section 4.06   Inventories...............................................................................15

    Section 4.07   Accounts Receivable................................................................15

    Section 4.08   Taxes. ......................................................................................15

    Section 4.09   Reserved. .................................................................................15

    Section 4.10   Compliance with Laws. ...........................................................15

    Section 4.11   Contracts. ................................................................................16

    Section 4.12   Employee Benefit Plans...........................................................16

    Section 4.13   Customers and Suppliers..........................................................16

    Section 4.14   Reserved. .................................................................................17

    Section 4.15   Reserved. .................................................................................17

    Section 4.16   Books of Account, Returns and Reports...................................17

    Section 4.17   Transactions with Affiliates. ...................................................17

    Section 4.18   Franchises, Permits and Licenses. ...........................................17

Section 4.19    Employees. ..............................................................................17

Section 4.20    Insurance. ...............................................................................17

Section 4.21    Intellectual Property...............................................................17

Section 4.22    Reserved. ................................................................................18

Section 4.23    Conditions Affecting Sellers. .................................................18

ARTICLE V - REPRESENTATIONS OF PURCHASER ........................................18

Section 5.01    Organization and Good Standing. ..........................................18

Section 5.02    No Violation; No Consents. ...................................................18

Section 5.03    Validity of Agreement. ..........................................................19

Section 5.04    Availability of Funds. ............................................................19

Section 5.05    Inspections; No other Representations. ..................................19

ARTICLE VI - ADDITIONAL AGREEMENTS ...................................................19

Section 6.01    Conduct of Business Prior to Closing.....................................19

Section 6.02    Access and Information. .........................................................20

Section 6.03    Further Agreements and Cooperation......................................21

Section 6.04    Litigation Support...................................................................21

Section 6.05    Insurance. ...............................................................................21

Section 6.06    Payments in Error. .................................................................21

Section 6.07    Excluded Containers. ..............................................................21

Section 6.08    Collection of Accounts Receivable; Use of Accounting Equipment and Software. ..............................................................................22

Section 6.09    Tax Matters. ...........................................................................22

Section 6.10    Public Announcements. ..........................................................23

Section 6.11    Employees. ..............................................................................23

Section 6.12    Restrictive Covenants. ...........................................................24

Section 6.13    Branding; Change of Name.....................................................25

Section 6.14    Submission for Bankruptcy Court Approval............................25

Section 6.15    Cure Costs. .............................................................................25

ARTICLE VII - SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION.........................................................................................26

Section 7.01    Survival of Representations and Warranties. ..........................26

Section 7.02    Indemnification of Purchaser by Sellers and Parent................26

Section 7.03    Indemnification of Sellers by Purchaser. ................................26

Section 7.04   Notice and Defense of Indemnity Claims. ................................................... 27

Section 7.05   Limitations of Indemnity. ............................................................................ 27

Section 7.06   Brokers. ...................................................................................................... 28

Section 7.07   Reserved. ..................................................................................................... 28

Section 7.08   Exclusive Remedy. ...................................................................................... 29

ARTICLE VIII - CONDITIONS PRECEDENT TO CLOSING ............................................. 29

Section 8.01   Conditions Precedent to the Obligations of Purchaser and Sellers. ........... 29

Section 8.02   Conditions to Purchaser's Performance. ...................................................... 29

Section 8.03   Conditions to Sellers' Performance. ............................................................ 31

ARTICLE IX - TERMINATION .......................................................................................... 31

Section 9.01   Termination Prior to Closing. ..................................................................... 31

Section 9.02   Effect of Termination. ................................................................................. 33

Section 9.03   Break Up Fee and Expense Reimbursement. ............................................... 33

Section 9.04   Payment of Break-Up Fee. .......................................................................... 33

Section 9.05   Payment of Expense Reimbursement.. ........................................................ 33

Section 9.06   Payment of Deposit. .................................................................................... 34

ARTICLE X - CLOSING ...................................................................................................... 34

Section 10.01  Closing Date. .............................................................................................. 34

Section 10.02  Sellers' Deliveries at Closing. ..................................................................... 34

Section 10.03  Purchaser's Deliveries at Closing. .............................................................. 35

ARTICLE XI - EXPENSES ................................................................................................... 35

Section 11.01  Expenses. .................................................................................................... 35

ARTICLE XII - RELEASE .................................................................................................... 35

Section 12.01  Release by Sellers. ...................................................................................... 35

Section 12.02  Release by Purchaser. ................................................................................. 36

ARTICLE XIII - CONSTRUCTION; WAIVER OF JURY TRIAL ....................................... 36

Section 13.01  Choice of Law; Venue; Waiver. .................................................................. 36

Section 13.02  Dispute Resolution. ..................................................................................... 36

Section 13.03  Headings. ..................................................................................................... 37

Section 13.04  Interpretation. .............................................................................................. 37

Section 13.05  Invalid Provisions. ....................................................................................... 37

Section 13.06  No Third Party Beneficiaries. ....................................................................... 37

iii

ARTICLE XIV - ASSIGNABILITY ...................................................................................37

    Section 14.01  Binding Agreement...................................................................................37

    Section 14.02  Assignability............................................................................................37

ARTICLE XV - NOTICES ...............................................................................................37

    Section 15.01  Written Notices........................................................................................37

    Section 15.02  Notice to Purchaser.................................................................................37

    Section 15.03  Notice to Sellers. ....................................................................................38

ARTICLE XVI - FURTHER ASSURANCES AND MISCELLANEOUS ...............................39

    Section 16.01  Entire Agreement, No Oral Change..........................................................39

    Section 16.02  Risk of Loss.............................................................................................39

    Section 16.03  Confidentiality of Information. .................................................................39

    Section 16.04  Reportable Transaction. ..........................................................................39

    Section 16.05  Counterparts; Electronic Signatures. .......................................................39

EXHIBITS

10.02(a)        Bill of Sale
10.02(b)        Assignment and Assumption Agreement
10.02(c)        Transition Services Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**"), dated as of the 6th day of December, 2022, is by and among AIRGAS USA, LLC, a Delaware limited liability company ("**Purchaser**"), MAGNEGAS WELDING SUPPLY – WEST, LLC, a California limited liability company ("**MagneGas**" or a "**Seller**"), MAGNEGAS REAL ESTATE HOLDINGS, LLC, a Delaware corporation ("**MagneGas RE**" or a "**Seller**"), and TARONIS FUELS, INC., a Delaware corporation ("**Parent**" or a "**Seller**" and, collectively with MagneGas and MagneGas RE, "**Sellers**").

## BACKGROUND

On November 11, 2022, Parent, MagneGas, MagneGas RE and certain of their affiliates (collectively the "**Debtors**") filed voluntary petitions for relief, commencing cases administered under lead Case No. 22-11121 (BLS) (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**");

Upon the terms and conditions set forth in this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, Sellers desire to sell, and Purchaser desires to purchase, (i) substantially all of the assets used or useful in the industrial gas and welding supply distribution business operated by Sellers from its locations in California (the "**Business**") and (ii) the Woodland Property (defined below), but expressly excluding the Excluded Assets.

Purchaser and Sellers desire to consummate the transactions contemplated herein as promptly as practicable after the entry of the Sale Order by the Court.

Parent is a party to this Agreement and Parent is the sole member of MagneGas and MagneGas RE.

Terms not otherwise defined herein shall have the meanings given to such terms in Article I hereof.

NOW THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements hereinafter contained, the parties hereto, each intending to be legally bound hereby, agree as follows:

## ARTICLE I -  DEFINITIONS

Section 1.01    Certain Definitions.  The following terms used in this Agreement shall have the meanings set forth below:

"**Accounts Receivable**" shall have the meaning given to such term in Section 4.07 hereof.

"**Action**" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"**Affiliate**" means, with respect to any Person, any Person, firm, corporation, partnership or association controlling, controlled by, or under common control with such Person.

"**Agreement**" shall have the meaning given to such term in the preamble of this Agreement.

"**Alternative Transaction**" shall have the meaning given to such term in Section 9.01(c) hereof.

"**Ancillary Documents**" shall have the meaning given to such term in <u>Section 10.02(c)</u> hereof.

"**Assigned Contract(s)**" shall have the meaning given to such term in <u>Section 4.11</u> hereof.

"**Assignment and Assumption Agreement**" shall have the meaning given to such term in <u>Section 10.02(b)</u> hereof.

"**Assumed Liabilities**" shall have the meaning given to such term in <u>Section 2.03</u> hereof.

"**Avoidance Actions**" means all causes of action for avoidance and recovery under Chapter 5 of the Bankruptcy Code, including any preferential transfer or fraudulent conveyance arising under Sections 547, 544, 548, 549 or 550 of the Bankruptcy Code or any state fraudulent conveyance or fraudulent transfer statute.

"**Bankruptcy Cases**" shall have the meaning given to such term in the Background of this Agreement.

"**Bankruptcy Code**" shall have the meaning given to such term in the Background of this Agreement.

"**Basket Amount**" means THIRTY-FIVE THOUSAND and 00/100 DOLLARS ($35,000).

"**Bill of Sale**" shall have the meaning given to such term in <u>Section 10.02(a)</u> hereof.

"**Books and Records**" means all books and records owned by Sellers relating to the Business except (a) documents relating to the ownership, formation and governance of Sellers, including stock records, corporate charter, operating agreement, and code of regulations, as amended, minutes and other records of director or manager and/or Parent meetings of Sellers and tax returns of Sellers, (b) materials owned by Sellers that do not pertain to the Business, (c) Sellers' business plans, strategies and financial records that solely address or reflect activities outside the Business, (d) medical records of employees and former employees for which the written consent to the release of such records is not obtained, (e) records relating to the Excluded Assets, (f) all records relating to any Action pending or threatened against Sellers and the facts and circumstances relevant thereto, (g) records containing the work product of any financial consultant or adviser or any legal counsel to Sellers or subject to the attorney-client privilege, (h) records of Sellers relating to the preparation for and negotiation of this Agreement and the performance by Sellers of its

obligations hereunder, and (i) any other records that Sellers are legally obligated to retain (e.g., employment records) (clauses (a) through (i), the "**Retained Records**").

"**Break-up Fee**" shall have the meaning given to such term in Section 9.03(a) hereof.

"**Business**" shall have the meaning given to such term in the Background of this Agreement.

"**Business Day**" means a day that is not a Saturday, Sunday or a day on which banking institutions in New York, New York are not required to be open.

"**Cap**" shall have the meaning given to such term in Section 7.05(b) hereof.

"**CERCLA**" shall have the meaning given to such term in Section 4.10(b) hereof.

"**Certified Containers**" shall have the meaning given to such term in Section 3.04(b) hereof.

"**Closing**" shall have the meaning given to such term in Section 10.01 hereof.

"**Closing Date**" shall have the meaning given to such term in Section 10.01 hereof.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Compton Lease**" means that certain lease agreement dated as of October 25, 2018 for the premises located at 401 N. Long Beach Boulevard, Compton, CA 90221 and subject to that certain Assignment, Assumption and Amendment of Lease dated February 22, 2019.

"**Containers**" shall have the meaning given to such term in Section 2.02(g) hereof.

"**Court**" shall have the meaning given to such term in the Background of this Agreement.

"**Cure Costs**" shall mean all cure costs that must be paid or otherwise incurred by Purchaser as a result or pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts as agreed by Sellers, in consultation with Purchaser, and applicable counterparties or as finally determined by the Court.

"**Debtors**" shall have the meaning given to such term in the Background of this Agreement.

"**Delaware Court**s" shall have the meaning given to such term in Section 13.01 hereof.

"**Deposit**" shall have the meaning given to such term in Section 3.04(a).

"**DIP**" shall have the meaning given to such term in Section 8.02(c).

3

"**Directed Third Party**" shall have the meaning given to such term in <u>Section 4.10(b)</u> hereof.

"**Employee Plan**" or "**Employee Plans**" shall have the meaning given to such term in <u>Section 4.12</u> hereof.

"**Environmental Laws**" means all Legal Requirements (as defined below) relating to the generation, storage, handling, release, discharge, emission, transportation, treatment or disposal of solid wastes, hazardous wastes, and hazardous, toxic or dangerous materials or substances, including CERCLA, the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Clean Air Act (as amended), the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Toxic Substances Control Act, the Hazardous Materials Transportation Act, the Atomic Energy Act, the Federal Insecticide, Fungicide and Rodenticide Act and the Federal Food, Drug and Cosmetic Act, all as amended from time to time.

"**Environmental Liability**" means any Liability imposed against the current or former owner or operator of property pursuant to the provisions of any Environmental Laws or pursuant to common law, and shall include all response costs, costs of Remediation, attorneys' fees and expert witness fees to investigate and defend such claims, personal injuries and any damages to natural resources and other property.  The term "Environmental Liability" shall include all theories of liability for environmental contamination of property, including theories arising under statute, common law or tort, and contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" shall have the meaning given to such term in <u>Section 2.02</u> hereof.

"**Excluded Container Liability**" means any Liability imposed against or incurred by Purchaser in connection with Excluded Containers.

"**Excluded Containers**" shall have the meaning given to such term in <u>Section 2.02(g)</u> hereof.

"**Excluded Liabilities**" means all Liabilities of Sellers other than Assumed Liabilities, including: (a) any Environmental Liabilities arising from or existing at the Real Property prior to the Closing Date; (b) any Excluded Container Liabilities; (c) any Product Liabilities; (d) any Tax Liabilities; (e) any Liabilities incurred by Sellers after the Closing Date; (f) any Liabilities incurred by Sellers in connection with this Agreement and the transactions provided for herein including counsel and accounting fees; (g) any Liabilities of Sellers under any contract, lease or other agreement which is not one of the Assigned Contracts shown on <u>Schedule 4.11</u> as being assumed by Purchaser; (h) any Litigation Liabilities; (i) any Liabilities of Seller or Parent pursuant to any loans, credit agreement, or other Indebtedness, including credit card Indebtedness, vehicle loans or any Indebtedness under the Paycheck Protection Program; (j) any accrued expenses, including any payroll, benefit, profit sharing or pension Liabilities as of the Closing Date; (k) any Liabilities to Affiliates of Sellers or related parties; (l) any Liabilities related to the conduct of Sellers prior to the Closing Date other than the Assumed Liabilities; and (m) any undisclosed Liabilities of the Business.

4

"**Expense Reimbursement**" shall have the meaning given to such term in <u>Section 9.03(a)</u> hereof.

"**Final Order**" means an order of the Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing, motion for new trial, or any other proceeding challenging the findings, conclusions or relief granted by the Court has been timely filed or otherwise commenced or, if any of the foregoing has been timely filed or otherwise commenced, it has been disposed of by the Court or other court of competent jurisdiction in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting and/or filing an appeal, a notice of appeal, motion for rehearing, motion for new trial , or any other proceeding challenging the finds, conclusions, or relief granted by the Court or other court of competent jurisdiction shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**Financial Statements**" shall have the meaning given to such term in <u>Section 4.14</u> hereof.

"**GAAP**" means United States generally accepted accounting principles as in effect on the date hereof.

"**Governmental Authority**" means any United States federal, state or local or any foreign government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"**Hazardous Substances**" shall have the meaning given to such term in <u>Section 4.10(b)</u> hereof.

"**Indebtedness**" means, for any Seller (i) all obligations for borrowed money, (ii) all obligations evidenced by bonds, debentures, notes or other similar instruments or debt securities, (iii) all obligations under swaps, hedges or similar instruments, (iv) all obligations for the deferred purchase price of any property or services (other than trade accounts payable and accrued expenses incurred in the Ordinary Course of Business), including earn-outs, payments under non-compete agreements and seller notes, (v) all obligations created or arising under any conditional sale or other title retention agreement, (vi) all obligations secured by a Lien, (vii) all obligations in respect of bankers' acceptances, surety bonds, performance bonds or letters of credit (except to the extent undrawn or uncalled), (viii) all obligations of any Person other than Sellers that are directly or indirectly guaranteed by any Seller, (ix) all interest, principal, prepayment penalties, premiums, fees or expenses due or owing in respect of any item listed in clauses (i) through (viii) above, (x) all obligations with respect to any unfunded or underfunded Employee Plan, (xi) any "applicable employment taxes" (as defined in Section 2302 of the CARES Act) unpaid as of the Closing Date that would have been due on or before the Closing Date but for Section 2302(a)(1) of the CARES Act, (xii) all obligations with respect to any severance which became payable prior to the Closing (whether due before or after the Closing) and all payroll Taxes due in connection therewith, and (xiii) any personal expenses (including professional fees, licenses, subscriptions, office supplies

expenses, bank service charges, IT expenses, donations and other non-recurring items) of any Seller included in any Seller's credit card balances or accounts payable or that are otherwise owed or payable by any Seller.

"**Indemnified Party**" shall have the meaning given to such term in <u>Section 7.04</u> hereof.

"**Indemnifying Party**" shall have the meaning given to such term in <u>Section 7.04</u> hereof.

"**Indemnity Claim**" shall have the meaning given to such term in <u>Section 7.04</u> hereof.

"**Insurance Policies**" shall have the meaning given to such term in <u>Section 4.20</u> hereof.

"**Intellectual Property**" means (a) all inventions (whether patentable or un-patentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all re-issuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof relating to the Business, (b) all trademarks, service marks, trade dress, logos, trade names, brand names, and designs, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith relating to the Business, (c) all copyrightable works, all copyrights and mask works, and all applications, registrations, and renewals in connection therewith relating to the Business, (d) all trade secrets and confidential business information (including technical information, concepts, techniques, operating and maintenance manuals, ideas, research and development, know-how, formulas, data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals) relating to the Business, (e) all computer software (including source code, data and related documentation), (f) Internet domain names and universal resource locators relating to the Business, (g) all other proprietary rights relating to the Business, (h) all copies and tangible embodiments thereof (in whatever form or medium) of Sellers, and (i) all goodwill associated with, and all derivatives, improvements and refinements of, any of the foregoing.

"**Knowledge**" means, with respect to any fact, circumstance, event or other matter in question, the knowledge of such fact, circumstance, event or other matter after reasonable inquiry. With respect to Sellers, "Sellers' Knowledge" means the actual knowledge of each of Jered Ruyle, and Jakob Ogdahl after reasonable inquiry. Any Person will be deemed to have knowledge of a particular fact, circumstance, event or other matter if (a) such fact, circumstance, event or other matter is reflected in one or more documents (whether written or electronic, including electronic mails sent to or by such individual) that have been in the possession of such individual, including personal files or (b) such fact, circumstance, event or other matter is reflected in one or more documents (whether written or electronic) contained in books and records of such Person that would reasonably be expected to be reviewed by an individual who has the duties and responsibilities of such individual in the customary performance of such duties and responsibilities.

"**Lease**" shall have the meaning given to such term in <u>Section 10.02(e)</u>.

6

"**Legal Requirements**" means all judgments, decrees, injunctions, orders, writs, rulings, laws, ordinances, statutes, rules, regulations, codes and other requirements of all applicable Governmental Authorities.

"**Liability(ies)**" means any Indebtedness, liability or obligation of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, known or unknown, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, and whether due or to become due.

"**Lien(s)**" means any and all liens (statutory or otherwise, including "lien" as defined in Section 101(37) of the Bankruptcy Code, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), hypothecations, encumbrances, security interests, mortgages, debts, levies, indentures, pledges, restrictions (whether on voting, sale, transfer, disposition or otherwise), charges, instruments, preferences, priorities, security agreements, conditional sales agreements, title retention contracts, options, claims (including "claim" as defined in Section 101(5) of the Bankruptcy Code), judgments, offsets, rights of recovery, rights of pre-emption, rights of first refusal or other third party rights, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or Tax (including claims for any and all foreign, federal, state and local Taxes), decrees of any court or foreign or domestic governmental entity, orders of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any claim based on any theory that either Purchaser is a successor or a continuation of the Debtors or the Debtors' business), reclamation claims, obligations, liabilities, demands, and guaranties, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability.

"**Litigation Liabilities**" means any Liability related to, or arising out of, any Action pending on the Closing Date against Sellers or any of their Affiliates or any future Action related to or arising out of Sellers' conduct of the Business prior to the Closing Date.

"**Losses**" shall have the meaning given to such term in <u>Section 7.02</u> hereof.

"**MagneGas**" shall have the meaning given to such term in the preamble of this Agreement.

"**MagneGas RE**" shall have the meaning given to such term in the preamble of this Agreement.

"**Ordinary Course of Business**" means an action taken by a Person only if that action:  (a) is in the ordinary course of the normal day-to-day operations of the Person and (b) is substantially consistent with such Person's recent past practice.

"**Ordinary Course of Sellers' Business**" means the Ordinary Course of Business in respect of the Business.

"**Outside Date**" shall have the meaning given to such term in Section 9.01(b) hereof.

"**Parent**" shall have the meaning given to such term in the preamble of this Agreement.

"**Pension Plan**" shall have the meaning given to such term in <u>Section 4.12</u> hereof.

"**Permitted Liens**" means (i) Liens that arise under zoning, building codes, land use and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement; (ii) Liens for Taxes not yet due and payable; (iii) with respect to leased or licensed property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assigned Contract; and (iv) any Permitted Exception, as defined in the Woodland PA.

"**Person**" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity.

"**Personal Property Leases**" shall have the meaning given to such term in <u>Section 4.05(a)</u> hereof.

"**Prepetition AR**" shall mean the amount owed to Purchaser by MagneGas arising from goods and services delivered to MagneGas by Purchaser prior to the filing of the Bankruptcy Cases, in the amount of $190,404.61.

"**Product Liabilities**" means any Liability related to, or arising from, the sale or rental or lease of defective products or equipment by Sellers, the failure by Sellers to adequately warn any purchaser or user of its products and equipment with respect to the proper use and storage thereof or the breach by Sellers of any express or implied warranty made in connection with the sale or rental or lease of any products or equipment prior to the Closing Date.

"**Purchased Assets**" shall have the meaning given to such term in <u>Section 2.01</u>.

"**Purchase Price**" shall have the meaning given to such term in <u>Section 3.01</u> hereof.

"**Purchase Price Allocation**" shall have the meaning given to such term in <u>Section 3.03</u> hereof.

"**Purchaser**" shall have the meaning given to such term in the preamble of this Agreement.

"**Purchaser Indemnitees**" shall have the meaning given to such term in <u>Section 7.02</u> hereof.

"**Purchaser Indemnity Claim**" shall have the meaning given to such term in <u>Section 7.02(e)</u> hereof.

8

"**Real Property**" shall have the meaning given to such term in <u>Section 4.05(b)</u> hereof.

"**Remediation**" means any removal, remedial and/or response actions, as those activities are defined and used in CERCLA and other Environmental Laws and all investigations, samplings and assessments incident thereto.

"**Retained Records**" shall have the meaning given to such term in the definition of Books and Records.

"**Sale Hearing**" shall mean as defined in the Sale Motion.

"**Sale Motion**" shall mean the motion of Sellers, in form and substance reasonably satisfactory to Purchaser, seeking entry of the Sale Order.

"**Sale Order**" means an order of the Court, in form and substance acceptable to Purchaser in its sole and absolute discretion and substantially in the form attached hereto as <u>Exhibit</u> B.

"**Sale Order Outside Date**" shall have the meaning given to such term in <u>Section 9.01(d)</u>.

"**Sellers**" shall have the meaning given to such term in the preamble of this Agreement.

"**Seller Indemnity Claims**" shall have the meaning given to such term in <u>Section 7.03(c)</u> hereof.

"**Tangible Personal Property**" shall have the meaning given to such term in <u>Section 4.05(a)</u> hereof.

"**Tax**" or "**Taxes**" means, collectively, all taxes, charges, fees, levies or other assessments, however denominated and whether imposed by a taxing authority within or without the United States of America, including all net income, gross income, gross receipts, sales, use, ad valorem, goods and services, capital, transfer, franchise, profits, license, withholding, payroll, employment, employer health, excise, estimated, severance, stamp, occupation, property or other taxes, custom duties, fees, unclaimed property, liabilities, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Liabilities**" means liability for Taxes of Sellers for any taxable period up to and including the Closing Date.

"**Tax Returns**" means, collectively, all returns, declarations, reports, estimates, information returns and statements required to be filed by Sellers with respect to the Business with any Governmental Authority under any Legal Requirement and any returns, forms or other documents required to be retained by Sellers in compliance with applicable tax reporting and withholding laws.

"**Transition Services Agreement**" shall have the meaning given to such term in <u>Section 10.0(c)</u> hereof.

"**Use Charges**" shall have the meaning given to such term in <u>Section 4.05(a)</u> hereof.

"**Wastes**" shall have the meaning given to such term in <u>Section 4.10(b)</u> hereof.

"**Woodland PA**" means the Purchase and Sale Agreement pursuant to which Purchaser shall purchase the Woodland Property from MagneGas RE.

"**Woodland Property**" the real property located at 1590 E. Kentucky Ave., Woodland, CA 95776 and any improvements thereon.

## ARTICLE II -  PURCHASE AND SALE OF ASSETS

Section 2.01    <u>Assets Purchased</u>.    Subject to the terms and conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase from Sellers, free and clear of any Liens (other than Permitted Liens), all of Sellers' right, title and interest in and to all of the assets, properties and rights which relate to, or are used or held for use in connection with, the Business, excluding the Excluded Assets (collectively, the "**Purchased Assets**"), including the following:

(a) the tangible assets used or useful in the Business and owned by Sellers, and all of the Accounts Receivable, vendor credits, deposits, inventories, intangible properties and fixed assets used or held for use in the Business (including Sellers' leasehold interest in cylinders and liquid containers leased from third parties upon and subject to the terms thereof), other than the Excluded Assets;

(b) all rights, causes of action, claims, refunds and demands of whatever nature, including rights to returned or repossessed goods and rights as unpaid vendor arising out of the Business;

(c) all rights, causes of action, claims, refunds and demands of whatever nature arising under (i) that certain Asset Purchase Agreement made as of February 22, 2019 by and between Complete Cutting & Welding Supplies, Inc., a California corporation and Taronis Technologies, Inc., a Delaware corporation, a non-executory contract and (ii) that certain restrictive covenants agreement entered into in connection therewith, a non-executory contract;

(d) copies of, and/or access to, all Books and Records relating to the Business concerning operations conducted during the five-year period preceding the Closing Date;

(e) all rights of Sellers in and to all of Sellers' Intellectual Property relating to the Business, all of which are set forth on <u>Schedule 4.21</u> to this Agreement;

(f) all of Sellers' intangibles and goodwill related to the Purchased Assets and/or used in the Business, including customer, vendor and business relationships;

(g) Assigned Contracts, including Tangible Personal Property subject to a lease and in the possession of Sellers' customers, including any security deposit; and

10

(h) the Woodland Property, which shall be transferred pursuant to the Woodland PA.

Section 2.02    Excluded Assets.    Notwithstanding the foregoing, Purchaser and Sellers agree that the following assets (the "**Excluded Assets**") shall not be included as Purchased Assets and shall be expressly excluded from the purchase and sale hereunder:

(a) cash, cash equivalents, and marketable securities;

(b) any contracts or obligations of Sellers, other than the Assigned Contracts;

(c) any performance and other bonds, security and other deposits, advance or prepaid payments, prepaid expenses, prepaid credits and deferred charges, except with respect to the Assigned Contracts;

(d) all insurance policies of Sellers and the rights thereunder;

(e) all claims of Sellers or any of their Affiliates for refunds of Taxes and other governmental charges;

(f) the Retained Records (as defined in the definition of Books and Records);

(g) all Employee Plans and assets attributable thereto;

(h) the rights which accrue or will accrue to Sellers under this Agreement and the Ancillary Documents;

(i) (i) all cylinders, tanks, containers or other vessels (collectively, "**Containers**") containing gases or other substances the identity of which cannot be readily and accurately determined by a visual examination of the Container itself or from the Books and Records as of the Closing Date, (ii) all Containers containing gases or other substances not sold in the Ordinary Course of Sellers' Business, (iii) all Containers that are permanently out-of-service as of the Closing Date, and (iv) any hardgoods inventory that has been reasonably determined by Purchaser to be obsolete or unsaleable based on its condition or appearance (with the items described in (i), (ii), (iii) and (iv) above being referred to collectively herein as the "**Excluded Containers**");

(j) any assets of Sellers or Parent not related to the Business, including any of Sellers' or Sellers' Affiliates' interests in or rights with respect to equity interests of Affiliates and third parties;

(k) Avoidance Actions;

(l) any and all claims or causes of action of Sellers, including against any director, officer, Insider (as defined in Section 101 of the Bankruptcy Code), auditor or accountant of Seller; and

(m) the assets of Sellers identified or listed on Schedule 2.02.

11

Section 2.03    Assumed Liabilities.    Subject to the terms and conditions set forth herein, Purchaser shall assume and agree to pay, perform and discharge only the following Liabilities of Sellers (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a) all Liabilities arising out of or relating to the Purchased Assets and the Business incurred or accruing on or after the Closing Date (but not prior to the Closing Date); and

(b) the obligations of future performance of Sellers in respect of the Assigned Contracts (designated on Schedule 4.11) but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the Ordinary Course of Sellers' Business, and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers on or prior to the Closing Date.

"**Assumed Liabilities**" shall in no event include the Excluded Liabilities or any Liability to the extent resulting from or arising out of the ownership, use or operation of any Excluded Asset.

Section 2.04    Liabilities Not Assumed.    Seller agrees that, except as set forth in Section 2.03 hereof or in any document or instrument required to be delivered in connection with the consummation of the transactions contemplated by this Agreement, Purchaser shall not assume or pay any Liabilities of Sellers or Parent, and Purchaser shall in no event assume any Excluded Liabilities.

## ARTICLE III -  PURCHASE PRICE; CLOSING

Section 3.01    Purchase Price.    The purchase price for the Purchased Assets is Five Million Nine Hundred Thousand Dollars ($5,900,000.00), plus the Assumed Liabilities, subject to adjustment as provided in Section 3.04 (such sum, the "**Purchase Price**"), and payable in the manner provided in Section 3.04.

Section 3.02    Reserved.

Section 3.03    Purchase Price Allocation.    The Purchase Price shall be allocated in accordance with Section 1060 of the Code on the basis of Closing Date financial statements and Purchased Asset counts conducted on or about the Closing Date, adjusted to reflect the actual results of operations of the Business through the Closing Date (the "**Purchase Price Allocation**"). For purposes of determining the Purchase Price Allocation, (i) Accounts Receivable (as defined herein) will be valued at their face amount, (ii) inventory will be valued at the lower of cost or market value, and (iii) fixed assets will be valued based on appraisals prepared by independent third parties or valued consistent with the valuation techniques and practices of Purchaser.  The parties agree to adopt and abide by the allocations provided for herein in all Tax filings, and agree to take no position inconsistent therewith.

Section 3.04    Payment of Purchase Price.

(a) Deposit.    Upon execution of this Agreement and the Woodland PA, Purchaser shall pay Two Hundred Thousand Dollars ($200,000) as a refundable deposit to Purchaser's Title Company (as defined in the Woodland PA) (the "**Deposit**").  Pending the

Closing, the Deposit shall be held by the Title Company and shall not be subject to the DIP and any Liens granted thereunder or otherwise, or any account sweep by any party.

(b) <u>Assumed Liabilities</u>.  At the Closing, Purchaser shall assume the Assumed Liabilities described in <u>Section 2.03</u>.

(c) <u>Closing Payments</u>. At the Closing, Purchaser shall pay Four Million Five Hundred Nine Thousand Five Hundred Ninety-Five and 39/100 ($4,509,595.39) (the "**Cash Closing Payment**") by wire transfer of immediately available funds to such escrow account as is designated to Purchaser by Sellers (such designation to be made at least five (5) Business Days prior to the Closing Date) with such funds to be distributed pursuant to the terms of the Sale Order.  The Cash Closing Payment shall be an amount equal to the Purchase Price:

(i) *less* the Purchase Price (as defined in the Woodland PA) of $1,200,000; and

(ii) *less* Prepetition AR.

## ARTICLE IV -  REPRESENTATIONS OF SELLERS AND PARENT

Sellers, jointly and severally, represent, warrant and agree that, as of the date hereof and as of the Closing Date:

Section 4.01   <u>Organization and Good Standing</u>.   Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as now being conducted, including the ownership of MagneGas and MagneGas RE and the operation of the Business, and, subject to entry of the Sale Order, has all requisite corporate power and authority to execute and perform this Agreement, the Ancillary Documents, and the transactions contemplated hereby and thereby.  MagneGas is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California, with full limited liability company power and authority to conduct the Business as now being conducted, and, subject to entry of the Sale Order, has all requisite limited liability company power and authority to execute and perform this Agreement, the Ancillary Documents, and the transactions contemplated hereby and thereby.  MagneGas RE is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, with full limited liability company power and authority to conduct the Business as now being conducted, and, subject to entry of the Sale Order, has all requisite limited liability company power and authority to execute and perform this Agreement, the Ancillary Documents, and the transactions contemplated hereby and thereby.

Section 4.02   <u>No Violation; No Consents</u>.    The execution and performance of this Agreement, and the consummation of the transactions contemplated hereby, will not: (i) violate any provision of the organizational documents of Parent, MagneGas, or MagneGas RE; (ii) violate or result in the breach of any term or provision of, or constitute a default or accelerate maturities under, any Indebtedness or any other loan similar agreement, instrument, indenture, mortgage, deed of trust, or other restriction to which any Seller is a party or by which any of the properties of any Seller is bound; or (iii) violate or result in a breach of any term or provision of or constitute a default or accelerate the terms of any right of first refusal agreement or any other similar

13

agreement or other restriction to which any Seller is a party or by which any of the Purchased Assets is bound.

Section 4.03    Validity of Agreement.    This Agreement and the transactions contemplated hereby have been duly authorized and approved by all requisite corporate action of each Seller, and this Agreement has been duly executed and delivered by each Seller and, subject to entry of the Sale Order, is the legal, valid and binding obligation of each Seller, enforceable in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency or similar laws of general application relating to or affecting the enforcement of creditors' rights and (ii) general principles of equity relating to the availability of equitable remedies.    Subject to entry of the Sale Order, no other proceedings are necessary to authorize this Agreement and the transactions contemplated hereby, or the performance or compliance by each Seller with any of the terms, provisions or conditions hereof.

Section 4.04    Ownership.    Parent is the sole record and beneficial owner of all of the issued and outstanding equity of MagneGas and MagneGas RE and Parent is the only manager of these entities.

Section 4.05    Assets; Real Property.

(a) Sellers have good and marketable title to all assets comprising all or a portion of the Purchased Assets.    To the best of Sellers' knowledge, all of the inventory, machinery, equipment, vehicles, welders, cylinders, tanks and other tangible personal property owned or used in the Business (other than the Excluded Assets) is listed either individually or by category on Schedule 4.05(A) with an indication of whether each item is owned by Sellers or leased from a third party ("**Tangible Personal Property**").    All such Tangible Personal Property is in good working order and operating condition, and the Purchased Assets are sufficient to operate the Business in the Ordinary Course of Sellers' Business.    Except for Tangible Personal Property identified as leased personal property on Schedule 4.05(B), all such Tangible Personal Property will be sold to Purchaser free and clear of all Liens whatsoever (other than Permitted Liens) pursuant to the Sale Order.    All of the Purchased Assets are in the possession of Sellers or Sellers' customers and, if in the possession of Sellers' customers, are held pursuant to binding agreements obligating each such customer to return or reimburse Sellers for such assets.    All material customer disputes relating to Sellers' right to collect total monthly cylinder and tank rental and/or lease charges billed to Sellers' customers, net of reductions made by reason of customer disputes ("**Use Charges**") have been investigated by Sellers and adjustments have been made within a reasonable time to the cylinder records.    To the best of Sellers' knowledge, Schedule 4.05(D) contains a list of the cylinders and tanks by size and type owned by Sellers, indicating whether each item is dock stock or located at a customer site, which list is true and correct in all respects, including any and all customer deposits on such cylinder and tanks.

(b) All real property owned by, leased to or otherwise occupied by Sellers for use in the conduct of the Business (the "**Real Property**") is listed on Schedule 4.05(E).    Sellers (as the tenant or owner) have not received notice (written or otherwise) that the present use of the Real Property is not in compliance with all applicable zoning ordinances (or variances therefrom) and other applicable government regulations, and Sellers have not received any

notice (written or otherwise) of any uncorrected violation of any housing, building, safety, fire or other ordinance or applicable Legal Requirement.  With respect to Real Property that is subject to a lease, and complete and correct copies including any amendments thereto, have been provided to Purchaser and are listed on Schedule 4.05(E).  Other than as set forth on Schedule 4.05(E), no underground tanks are currently used, or were used at any time that Sellers owned or leased the Real Property, for the storage of any gas or petroleum products, and if any such tanks previously existed and were removed by Sellers, they were removed in accordance with all Legal Requirements.

(c) Sellers are assigning to the fullest extent permitted by law and the applicable agreements all rights, causes of action, claims, refunds and demands of whatever nature owned by its Affiliates that have arisen or may arise under (i) that certain Asset Purchase Agreement made as of February 22, 2019 by and between Complete Cutting & Welding Supplies, Inc., a California corporation and Taronis Technologies, Inc., a Delaware corporation, including all agreements ancillary thereto, a non-executory contract and (ii) that certain restrictive covenants agreement entered into in connection therewith, a non-executory contract.

Section 4.06    Inventories.    Schedule 4.06 includes a detailed inventory subledger for Sellers as of a date that is not more than five (5) Business Days prior to the date hereof. Except as described on Schedule 4.06, all gas and hardgoods inventories of Sellers are usable in the Ordinary Course of Sellers' Business, and are good and merchantable and readily saleable in the Ordinary Course of Sellers' Business.

Section 4.07    Accounts Receivable.    All of Sellers' accounts receivable ("**Accounts Receivable**") arose in the Ordinary Course of Sellers' Business, are good and collectable within one hundred twenty (120) days after the Closing Date, and such Accounts Receivable are not subject to any counterclaims or setoffs.  Schedule 4.07 includes a detailed Accounts Receivable aging report for Sellers as of a date that is not more than five (5) Business Days prior to the date hereof.

Section 4.08    Taxes.    Sellers have filed all Tax Returns and reports required by law to have been filed by it as of the Closing Date, and has paid all Taxes due and payable by it as of the Closing Date.  None of the Purchased Assets constitutes "tax exempt use property" within the meaning of Section 168(h)(i) of the Code.  None of the Purchased Assets is property required to be treated as being owned by another Person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986. Sellers have a zero account balance with the State of California Department of Tax and Fee Administration as of the Closing Date.

Section 4.09    Reserved.

Section 4.10    Compliance with Laws.

(a) The Purchased Assets and Sellers' operation of the Business are in compliance in all material respects with all Legal Requirements.

(b) The Real Property has not been used by Sellers, any third party acting on behalf of, or at the direction of, Sellers (a "**Directed Third Party**") or, to Sellers' Knowledge,

15

any other party for the generation, manufacture, storage or disposal of any Hazardous Substances or Wastes, and neither Seller nor a Directed Third Party transported any Hazardous Substances or Wastes to or from the Real Property in connection with Sellers' activities, events, conditions or occurrences on or at the Real Property prior to the Closing Date. There are no Hazardous Substances or Wastes present on or under or emanating from the Real Property. Neither Seller nor any Directed Third Party nor, to Sellers' Knowledge, any other party has used the Real Property in any manner that would require any closure or cessation of the use of the Real Property under any applicable Environmental Law or subject Sellers or Purchaser to any Environmental Liability. Sellers have not received any notice (written or otherwise) from any Governmental Authority that a Seller is involved in any pending or, to Sellers' Knowledge, threatened, Action as a responsible party or potentially responsible party for any Liability for disposal or release of any Hazardous Substances or Wastes. No Lien has been recorded or, to Sellers' Knowledge, asserted or threatened against the Real Property for any Environmental Liability. The Real Property has not been listed on either the National Priorities List (as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. ("**CERCLA**")), or any state listing of hazardous sites. For the purposes hereof, (i) "**Hazardous Substances**" means any flammables, explosives, radioactive materials, asbestos, ureaformaldehyde, per- and polyfluoroalkyl substances (PFAS), hazardous wastes, toxic substances or any other elements or compounds designated as a "hazardous substance," "pollutant" or "contaminant" in CERCLA, or in the Resource Conservation and Recovery Act, 42 U.S.C. Section 6991 et seq., or any other applicable Legal Requirement and (ii) "**Wastes**" means any hazardous wastes, residual wastes, solid wastes or other wastes as those terms are defined in the applicable Legal Requirements.

Section 4.11    Contracts.    Schedule 4.11 identifies those contracts designated by Purchaser to be assigned to and assumed by Purchaser (the "**Assigned Contracts**"), which schedule may be updated by Purchaser from time to time up to and including the Closing Date to add or remove Assigned Contracts. Except as set forth on Schedule 4.11, each of the Assigned Contracts contains the entire agreement of the parties thereto, with respect to the subject matter thereof, is in full force and effect, and is valid and enforceable in accordance with its terms. Subject to entry of the Sale Order, all of the Assigned Contracts are assignable to Purchaser without the consent or approval of other parties. For the avoidance of doubt, if any Governmental Authority requires Sellers and/or Purchaser, in order to assign or novate any Assigned Contract to Purchaser, to enter into any agreement with terms, conditions, recitals or stipulations that conflict with any provision of this Agreement, such agreement shall in no way amend, supplement or otherwise modify any provision of this Agreement and this Agreement shall control as between Sellers and Purchaser. The Cure Costs for the Assigned Contracts is set forth on Schedule 4.11.

Section 4.12    [Reserved]  .

Section 4.13    Customers and Suppliers.    MagneGas has furnished to Purchaser a complete list of all of MagneGas's customers and suppliers related to or pertaining to the Purchased Assets and the Business with whom MagneGas has done business during 2021 or 2022. No current customer of MagneGas has given notice (written or otherwise) that it intends to terminate or modify its relationship adversely with MagneGas. MagneGas has not engaged in any forward selling or granted any unusual sales or terms of sale to any customer other than in the

Ordinary Course of Sellers' Business.  Other than in the Ordinary Course of Sellers' Business, there are no customer deposits or material customer prepayments.

Section 4.14    Reserved.

Section 4.15    Reserved.

Section 4.16    Books of Account, Returns and Reports.    Sellers' books of account accurately reflect all of Sellers' items of income and expense, and all of Sellers' assets (including the Purchased Assets), Liabilities and accruals.

Section 4.17    Transactions with Affiliates.    No Seller (i) has a contractual relationship with any Affiliate relating to the Business or (ii) owns any equity interests of, or has any other direct or indirect interest in, any Person, firm, corporation or entity which has a material business relationship (as creditor, lessor, or otherwise) with Sellers relating to the Business.

Section 4.18    Franchises, Permits and Licenses.    Schedule 4.18 contains a complete and correct list or summary description of all material franchises, permits, licenses, approvals and other authorizations from any Governmental Authority held by Sellers in connection with the Purchased Assets or the conduct of the Business or the Real Property as presently conducted.  True and complete copies of each such written franchise, permit, license, approval and authorization have been furnished to Purchaser.  There are no additional material franchises, permits, licenses, approvals or authorizations necessary for the conduct of the Business or the use of the Real Property as presently conducted and used.

Section 4.19    Employees.    Schedule 4.19 contains a complete list of all the employees of Sellers employed in the Business as of the date set forth thereon and, for each such employee, his or her current title, exempt or non-exempt status, salary or wage, date of hire, and bonuses and salary increases within the past year.  There are no employment or consulting contracts with any employees or consultants that require Sellers to employ an employee or engage a consultant for a fixed term or that restrict the right of Sellers to terminate such employee or consultant.  No current employee of any Seller has given notice (written or otherwise) that it intends to terminate or modify its relationship adversely with Sellers and Sellers agree to promptly notify Purchaser if Sellers receive any written notice prior to the Closing from any such employee that such employee intends to effect any such material adverse change in any such relationship.

Section 4.20    Insurance.    There is in full force and effect one or more policies of insurance issued by insurers of recognized responsibility, insuring Sellers and their respective properties, products and the Business against such losses and risks, and in such amounts, as are customary for companies of the size and in similar industries of Sellers.  No Seller has been refused any insurance coverage sought or applied for, and no Seller has reason to believe that it would be unable to renew its existing insurance coverage as and when the expires, on terms at least as favorable to those currently in effect, other than increases in premiums that do not result from any act or omission of Sellers.

Section 4.21    Intellectual Property.

17

(a) Sellers own or have the right to use pursuant to license, sublicense, agreement, or permission, all Intellectual Property, if any, used in the Business as presently conducted.  All issued, registered or applied for Intellectual Property owned by Sellers is set forth on <u>Schedule 4.21</u>

(b) Sellers have not received any written notice that Sellers or the Business have interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of any Person, and Sellers have not received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that Sellers must license or refrain from using any Intellectual Property rights of any Person).  To Sellers' Knowledge, no person has interfered with, infringed upon, misappropriated, or otherwise come into conflict with, any of the Intellectual Property of Sellers.

(c) No Action is pending or, to Sellers' Knowledge, is threatened that challenges the legality, validity, or enforceability of the underlying item of Intellectual Property.

(d) <u>Schedule 4.21(d)</u> contains a true and correct list of all cylinder neck rings and markings used in the Business and Sellers have the full right to use such neck rings and markings in the Ordinary Course of Sellers' Business.  <u>Schedule 4.21(d)</u> also includes a list of all telephone and facsimile numbers used at any location used in the Business.

Section 4.22    <u>Reserved</u>.

Section 4.23    <u>Conditions Affecting Sellers</u>.  There are no conditions existing with respect to Sellers' markets, products, facilities, personnel or raw material supplies that would reasonably be expected to have a material and adverse effect on the Purchased Assets or the Business, other than such conditions as generally affect the industry as a whole.  No representation or warranty or other statement made by Sellers in this Agreement, the Schedules, the Ancillary Documents or otherwise in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make such statements not misleading.

## ARTICLE V -  REPRESENTATIONS OF PURCHASER

Purchaser hereby represents, warrants and agrees that, as of the date hereof and as of the Closing Date:

Section 5.01    <u>Organization and Good Standing</u>.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, with full limited liability company power and authority to conduct its business as such business is now being conducted, and has all requisite limited liability company power and authority to execute and perform this Agreement and the transactions contemplated hereby.

Section 5.02    <u>No Violation; No Consents</u>.    The execution and the performance of this Agreement, and the consummation of the transactions contemplated hereby, will not violate: (i) any provision of the Certificate of Formation or Operating Agreement of Purchaser; or (ii) violate or result in the breach of any term or provision of, or constitute a default or accelerate maturities

under any loan or other similar agreement, instrument, indenture, mortgage, deed of trust, or other restriction to which Purchaser is a party or by which any of Purchaser's property is bound.

Section 5.03    <u>Validity of Agreement</u>.  This Agreement and the transactions contemplated hereby have been duly authorized and approved by all requisite action of Purchaser, and this Agreement has been duly executed and delivered by Purchaser and, subject to entry of the Sale Order, is the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency or similar laws of general application relating to or affecting the enforcement of creditors' rights and (ii) general principles of equity relating to the availability of equitable remedies.  No other proceedings are necessary to authorize this Agreement and the transactions contemplated hereby, or the performance or compliance by Purchaser with any of the terms, provisions or conditions hereof.

Section 5.04    <u>Availability of Funds</u>.  Purchaser has sufficient funds to pay the Purchase Price and all fees and expenses relating to the transactions contemplated hereby.

Section 5.05    <u>Inspections; No other Representations</u>. Purchaser hereby acknowledges and agrees that, except as expressly provided otherwise in this Agreement, the Schedules, and the Ancillary Documents, and except for any fraud or intentional representation by Sellers, the Purchased Assets are sold "as is" and "where is" and Purchaser agrees to accept the Purchased Assets in the condition they are in on the Closing Date.  Purchaser hereby acknowledges and agrees that, except as expressly set forth in this Agreement, the Schedules, and the Ancillary Documents, and except as included in public filings made by Parent, neither any Seller nor any other Person has made any representation or warranty (express or implied) of any kind (including as to accuracy or completeness) on behalf of any Seller with respect to any Seller, the Purchased Assets, the Business, or the transactions contemplated hereunder and/or any matter relating thereto (including with respect to (i) the future performance of the Purchased Assets or the Business, (ii) any projections, estimates or budgets delivered or made available to Purchaser or any of its Affiliates, or its counsel, accountants or advisors of future revenues, future results of operations (or any component thereof), future cash flows, future financial condition (or any component thereof), future business or future operations or (iii) any other information and/or documents delivered or made available to Purchaser or any of its Affiliates, or its counsel, accountants or advisors, with respect to Sellers, the Purchased Assets, the Business, or the transactions contemplated hereunder (including any information and/or documents delivered or made available during or in connection with Purchaser's due diligence and any information and/or documents delivered or made available in any "data room")), and Purchaser hereby expressly disclaims reliance on any representation or warranty (express or implied) of any kind (including as to accuracy or completeness), except for those representations and warranties expressly set forth in this Agreement, the Schedules or any Ancillary Document.

**ARTICLE VI -  ADDITIONAL AGREEMENTS**

Section 6.01    <u>Conduct of Business Prior to Closing</u>.    From and after the date of this Agreement through the Closing, Sellers and Parent covenant and agree that, with respect to the Purchased Assets and Sellers' operation of the Business:

19

(a) the Business will be conducted only in the Ordinary Course of Sellers' Business, including normal commitments for the purchase of supplies and the sale of goods and services;

(b) no material contract will be entered into by or on behalf of Sellers relating to the Purchased Assets or the Business;

(c) Sellers will promptly notify Purchaser if Sellers receives any notice (written or oral) from any material customer regarding or contemplating any adverse change in the customer's relationship with the Business, whether before or after the Closing Date;

(d) Sellers will not pay any bonuses or approve any salary or wage increases or any contributions to any Employee Plan for any of the employees of Sellers or the Business other than in the Ordinary Course of Sellers' Business in amounts calculated on a basis consistent with past practices;

(e) with respect to the Purchased Assets and the operation of the Business, Sellers will use commercially reasonable efforts to preserve Sellers' business organization intact, to keep available the services of present employees and to preserve Sellers' reputation and goodwill;

(f) Sellers will not pay, loan, advance or distribute, any amounts to any director, officer or equity owner of Sellers, except for payments made in accordance with past practices (including distributions to equity owners of Sellers in accordance with past practices) or as disclosed in this Agreement or a schedule attached hereto;

(g) Sellers will not enter into any agreement or arrangement with any director, officer or equity owner of Seller or any member of such Person's family with respect to the Purchased Assets or the Business, except as disclosed in this Agreement or a schedule attached hereto;

(h) no Seller will sell or lease any of its assets or properties, tangible or intangible (including the Purchased Assets) used in the operation of the Business, except in the Ordinary Course of Sellers' Business;

(i) no Seller will agree to do any of the foregoing; and

(j) Sellers will maintain the Purchased Assets in good condition and repair (normal wear and tear excepted) and insured under the insurance coverage in effect as of the date hereof.

Section 6.02   Access and Information.    Upon reasonable advance notice and with mutually agreeable scheduling, Sellers will give to Purchaser and to Purchaser's officers, employees, counsel, accountants, auditors, and other independent contractors, representatives and designees full and unlimited access, during normal business hours throughout the period after the signing of this Agreement and prior to Closing, to Sellers' offices, plants, properties (including access to conduct environmental site assessments), tax returns, books and records (including the Assigned Contracts), files and, with Sellers' consent (which consent will not be unreasonably

withheld, conditioned or delayed) and in the presence of Sellers' designee, Sellers' employees, related to the Purchased Assets and the Business, will furnish Purchaser with copies of any such materials and will allow Purchaser (and its said representatives and designees) to inspect the accounting work papers and other records of Sellers' independent accountant relating to the Purchased Assets and the Business, all in order that Purchaser may have full opportunity to make such legal, financial, tax, technical, accounting and other reviews and investigations of the Purchased Assets and the Business as Purchaser shall desire to make.  Except as otherwise provided in this Agreement, Purchaser's review and investigation hereunder shall in no way be deemed to relieve any Seller from any of the representations, warranties and agreements made herein.

Section 6.03    Further Agreements and Cooperation.   Each party hereto agrees to execute such further papers or agreements and to take such other actions as may be necessary to effect the purposes of this Agreement and to carry out its provisions, including such documents and actions as shall be necessary to ensure the orderly transfer of the customers of the Business to Purchaser.

Section 6.04    Litigation Support.   In the event and for so long as any party hereto actively is contesting or defending against any Action in connection with (a) any transactions contemplated under this Agreement or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Purchased Assets or the Business, the other parties will, to the extent not prohibited by law or court order, reasonably cooperate with such party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to their books and records as shall reasonably be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending party (unless the contesting or defending party is entitled to indemnification pursuant to this Agreement).

Section 6.05    Insurance.   Sellers will not take any action that could cause the Business to fail to maintain in full force and effect the insurance coverage provided by the Insurance Policies described on Schedule 4.20 as the policies currently in effect or insurance policies providing substantially the same coverage, up to and including the Closing Date.

Section 6.06    Payments in Error.   After the Closing Date, to the extent that any customers, vendors or any other third parties remit funds (including electronic payments or credit card payments) to Sellers in error that are rightfully due and payable to Purchaser, including payment of Purchaser's accounts receivable related to the Business subsequent to the Closing Date, Sellers will remit such funds to Purchaser within ten (10) days of discovering such funds in error, whether on its own or by means of notice from Purchaser.

Section 6.07    Excluded Containers.   As promptly as practicable following the date of this Agreement, Purchaser shall perform (accompanied by a representative of Sellers) an inventory count of cylinders, including identification of the Excluded Containers that are apparent on a visual inspection.  Purchaser shall identify Excluded Containers at each location of the Business.  Sellers shall control the removal and disposal of all such Excluded Containers and shall cause such removal and/or disposal to be performed in a manner that is consistent with accepted industry practice and pricing, and in accordance with all applicable Legal Requirements.

Section 6.08    Collection of Accounts Receivable; Use of Accounting Equipment and Software.  During the one hundred twenty (120) day period following the Closing Date, Purchaser shall use its commercially reasonable efforts to collect all Accounts Receivable.  All payments made by third parties shall be credited to the oldest outstanding invoice of Sellers unless specifically designated by the third party as a payment for a different invoice. During the one hundred twenty (120) day period following the Closing Date, Sellers will also permit Purchaser and Purchaser's employees to have access to and utilize Sellers' computer systems and software to permit Purchaser to record sales, billing, customer and other operational data related to the Purchased Assets until Purchaser has transferred all required data to its systems.

Section 6.09    Tax Matters.

(a) After Closing, Sellers, on the one hand, and Purchaser, on the other hand, shall each (i) promptly inform the other party in writing of any notice received of any audit, investigation, request for documents or information related to Taxes that could affect the Tax liability of the other party; provided, however, that any failure to provide such notice shall not affect the indemnification obligations of Sellers and Parent under Article VII, (ii) provide the other party, at the other party's expense, with such reasonable assistance requested in connection with the preparation of any Tax return, audit or other examination by any taxing authority or judicial or administrative Action relating to liability for Taxes, (iii) retain and provide to the other party all records and other information that may be relevant to any such Tax return, audit or examination, proceeding or determination and (iv) provide the other party with any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax return of the other party for any period.  Without limiting the generality of the foregoing, Sellers will retain, until the expiration of the applicable statutes of limitation (including any extensions thereof), copies of all Tax returns, supporting work schedules and other records relating to taxable periods or portions thereof of Sellers ending on or prior to the Closing Date.

(b) Taxes regarding the Business or the Purchased Assets (including Taxes charged as additional rent under leases assumed by Purchaser) for which Purchaser may be liable that are payable with respect to any taxable period that includes but does not end on the Closing Date, shall be allocated to the period prior to the Closing as follows: (i) Taxes imposed on a periodic basis with respect to any assets or otherwise measured by the level of any item (but excluding in any event any income, gross receipts, payroll, sales or use Taxes), shall be allocated by a fraction the numerator of which is the number of calendar days in the taxable period prior to the Closing Date and the denominator of which is the number of calendar days in the entire taxable period, and (ii) any income, gross receipts, payroll, sales or use and all other Taxes, shall be allocated based on the amount which would be payable if the taxable year ended on the close of the day before the Closing Date; provided that all revenue received (and/or expenses incurred) relating to the Purchase Price or any compensation contingent on the closing of the transactions contemplated hereby belong to Sellers, and Sellers shall be solely liable for all Tax liability with respect to such income and expenses.

(c) All sales and transfer taxes, including real estate transfer taxes, and vehicle sales and transfer taxes, arising by reason of the transactions contemplated by this Agreement shall be borne by Purchaser.

(d) The parties shall make all Tax filings consistent with the Purchase Price Allocation, including federal Form 8594.

(e) If Sellers are doing business in any state or local jurisdiction that imposes successor liability for any type of Taxes on a purchaser of substantially all of the assets of a company of the same type as Sellers, Sellers will, at or immediately following Closing, (i) file requests for any applicable Tax clearances or other similar certificates eliminating or fixing the maximum amount of such successor liability in any jurisdiction that requires a seller to initiate such requests, and/or (ii) cooperate fully with Purchaser to file requests for any applicable Tax clearances or other similar certificates in any jurisdiction that requires a purchaser to initiate such requests.

Section 6.10    Public Announcements.    Neither Purchaser nor Sellers shall issue a press release, publicity statement or other public notice relating to this Agreement or the transactions contemplated hereby without the prior written consent of the others; provided, however, that to the extent a particular action is required by any applicable Legal Requirement, such prior written consent shall not be unreasonably withheld, conditioned or delayed, by any party.

Section 6.11    Employees.

(a) From and after the date hereof, Purchaser and/or its representatives may meet and otherwise communicate with employees of Sellers, upon prior written notice to Sellers (in a manner so as not to interfere unreasonably with the normal business operations of any Seller) in order to discuss the impact of the transactions contemplated by this Agreement and Purchaser's intentions with respect to Sellers' employees, and to interview and offer employment pursuant to the terms of this Section 6.11. Commencing not later than three (3) Business Days after the date of this Agreement, (i) Purchaser shall be permitted to introduce itself to the employees of Sellers at in-person or virtual meetings, and attend additional in-person or virtual meetings with employees of Sellers following the initial meetings, in each case, in the presence of representatives of Sellers at such locations and times as are mutually agreed by Purchaser and Sellers (such agreement not to be unreasonably withheld, delayed or conditioned) and (ii) Purchaser and Sellers shall cooperate in good faith in developing and implementing an employee communication plan pursuant to which one or more written communications about Purchaser, the transactions contemplated hereby and Purchaser's plans or intentions with respect to the Purchased Assets will, from time to time, be distributed to employees and pursuant to which meetings of Purchaser with employees of Sellers may be scheduled.

(b) Sellers shall pay any amounts due to its employees through the Closing Date on their regularly scheduled payday for accrued wages and benefits and any other claims or obligations related to the employment of such employees prior to Closing.

(c) Sellers agree that they will comply with COBRA after the Closing Date with respect to all qualified beneficiaries who had a qualifying event as of or prior to the Closing Date, including any former employees of Sellers who are hired by Purchaser, but who are entitled to elect COBRA coverage under Sellers' Employee Plan as may be required by applicable law.  Sellers and Purchaser agree that Purchaser does not intend to be and is not a

23

successor employer to Sellers for any purpose, and Purchaser shall not assume any Employee Plan of Sellers or any obligations thereunder.

(d) Sellers agree to use commercially reasonable efforts to assist Purchaser to retain the employees of Sellers, including by giving Purchaser reasonable access to discuss employment with such employees as described in <u>Section 6.11(a)</u> above.  Prior to being hired by Purchaser, employees of Sellers will be required to pass the standard drug test, background check and sign non-disclosure agreements, which are administered to all new employees of Purchaser before they are offered employment by Purchaser.  All employees of Sellers hired by Purchaser immediately following the Closing Date shall be eligible for participation in Purchaser's standard employee benefits, including health and life insurance and 401(k) plans (subject to the amendment, modification or termination of any such plans).

Section 6.12    <u>Restrictive Covenants</u>. For a period of five (5) years from and after the date hereof, no Seller and none of their respective Affiliates shall, directly or indirectly, (a) engage or participate in any manner anywhere within one hundred fifty (150) miles of any of Sellers' current locations in any business that is competitive with the Business.  The parties agree that, if any court of competent jurisdiction finally determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this <u>Section 6.12</u> is unreasonable, arbitrary, against public policy or otherwise unenforceable under the circumstances, then any such provision shall be revised by such court to a lesser period of time, geographical area, business limitation or other relevant feature, as the case may be, which is determined by such court to be as close to the original provision as possible and enforceable against the applicable party under the circumstances, and such provision shall be enforced accordingly.  Sellers acknowledge and agree that (u) the covenants and agreements set forth in this <u>Section 6.12</u> were a material inducement to Purchaser to enter into this Agreement and to perform its obligations hereunder, (v) Purchaser would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if Sellers or any of their respective Affiliates breached the provisions of this <u>Section 6.12</u>, (w) any breach of the provisions of this <u>Section 6.12</u> by Sellers or their respective Affiliates would result in a significant loss of goodwill by Purchaser, (x) the length of time, scope and geographic coverage of the covenants set forth in this <u>Section 6.12</u> is reasonable given the benefits Seller is receiving hereunder, (y) Sellers are familiar with all the restrictive covenants contained in this <u>Section 6.12</u> and are fully aware of their respective obligations hereunder, and (z) no Seller will challenge the reasonableness of the time, scope, geographic coverage or other provisions of this <u>Section 6.12</u>.  Sellers further acknowledge and agree that irreparable injury will result to Purchaser if Sellers or any of their respective Affiliates breach any of the terms of this <u>Section 6.12</u>, and that in the event of an actual or threatened breach by Sellers or any of their respective Affiliates of any of the provisions contained in this <u>Section 6.12</u>, Purchaser will have no adequate remedy at law.  Sellers accordingly agree that in the event of any actual or threatened breach by Sellers or any of their respective Affiliates of any of the provisions contained in this <u>Section 6.12</u>, Purchaser shall be entitled to injunctive and other equitable relief. Nothing contained herein shall be construed as prohibiting Purchaser from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove.  Sellers shall cause their respective Affiliates to comply with this <u>Section 6.12</u>, and shall be liable for any breach by any of their respective Affiliates of this <u>Section 6.12</u>.

Section 6.13    Branding; Change of Name.    Except as contemplated by this Agreement or the Ancillary Documents, as of the Closing Date, Sellers shall discontinue any use of the name MagneGas Welding Supply – West, LLC and/or any similar name, or any other symbol, trademark, service mark, logo or trade name now used by Sellers in the conduct of the Business.  In furtherance of the covenant above, within fourteen (14) days after the Closing Date, MagneGas shall change its corporate name from MagneGas Welding Supply – West, LLC. Notwithstanding the foregoing, any Affiliate of Sellers may continue to use any name, symbol, trademark, service mark, logo or trade name now used by such Affiliate in the conduct of its business and operations.

Section 6.14    Submission for Bankruptcy Court Approval.

(a)  Purchaser and Sellers acknowledge that this Agreement and the transactions contemplated hereby are subject to approval by the Court and entry of the Sale Order.  In the event of any discrepancy between this Agreement and the Sale Order, the Sale Order shall govern.

(b)  Sellers shall use commercially reasonable efforts to have the Court hold the Sale Hearing and enter the Sale Order as promptly as practicable.

(c)  From and after the date hereof, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order. Purchaser has not colluded in connection with its offer or negotiation of this Agreement.  From and after the date hereof, Purchaser shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order or consummation of the transactions contemplated hereby.

(d)  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Purchaser or Sellers be required to agree to any amendment of this Agreement.

(e)  Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan Sellers submit to the Bankruptcy Court, or any other court for confirmation or sanction, shall not be intended to (or reasonably likely to) supersede, abrogate, nullify or restrict the terms of this Agreement in any material respect, or prevent the consummation or performance of the transactions contemplated hereby.

Section 6.15    Cure Costs.  Sellers shall sell, transfer and assign, all Assigned Contracts to Purchaser, and Purchaser shall purchase and assume all Assigned Contracts from Sellers, as of the Closing Date pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order. In connection with debts incurred or the assignment and assumption of the Assigned Contracts, Purchaser shall cure any monetary defaults of the debts incurred or under the Assigned Contracts by payment of any Cure Costs as determined in accordance with the Sale Order. Purchaser shall

25

be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assigned Contracts.

### ARTICLE VII - SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

Section 7.01    Survival of Representations and Warranties.    The representations and warranties of the parties contained in this Agreement or in any schedule or exhibit or other writing delivered pursuant to the provisions of this Agreement or in connection with the transactions contemplated hereby, shall survive the Closing for a period of twenty-four (24) months after the Closing Date, except for (i) representations and warranties with respect to Taxes and title, which shall survive for the applicable statute of limitations plus sixty (60) days, and (ii) representations and warranties with respect to environmental matters (including those set forth in Section 4.10(b)), which shall survive for seven (7) years following the Closing Date.    Liability for fraud (constructive or actual) and intentional misrepresentation shall survive without regard to the foregoing limitations.    Nothing contained in this Section 7.01 shall be deemed to affect the continuing obligations of the parties hereto as specifically provided in this Agreement, including the obligations of the parties under Section 7.02 hereof.

Section 7.02    Indemnification of Purchaser by Sellers and Parent.    Subject to the terms, conditions and limitations contained in this Article VII, Sellers, jointly and severally, agree to defend, indemnify and hold harmless Purchaser and its Affiliates and their respective officers, directors, agents and representatives and the respective successors and permitted assigns of each of the foregoing (collectively, the "**Purchaser Indemnitees**") against and in respect of any costs, damages (including claims for Remediation), losses, expenses, claims, obligations, or other liabilities (including legal and other expenses incurred in investigating and defending or enforcing any claims or deficiencies) (collectively, "**Losses**"), incurred by the Purchaser Indemnitees to the extent resulting or arising from:

(a) Sellers' operation of the Business prior to the Closing Date (except for the Assumed Liabilities);

(b) the Excluded Assets;

(c) the Excluded Liabilities;

(d) any breach of any representation or warranty hereunder (or under any certificate delivered in accordance herewith) by Sellers; or

(e) any breach of any covenant or obligation hereunder (or under any Ancillary Documents) by Sellers (with the items described in (a) through (e) above being referred to collectively herein as "**Purchaser Indemnity Claims**").

Section 7.03    Indemnification of Sellers by Purchaser.    Subject to the terms, conditions and limitations contained in this Article VII, Purchaser agrees to defend, indemnify and hold harmless Sellers and their Affiliates and their respective officers, directors, agents, representatives, successors and assigns against any and all Losses arising from or relating to:

26

(a) the operation, ownership and possession of the Purchased Assets and the Business by Purchaser following the Closing Date;

(b) the Assumed Liabilities;

(c) any breach of any representation or warranty hereunder (or under any certificate delivered by Purchaser in accordance herewith) by Purchaser; or

(d) any breach of any of Purchaser's covenants under this Agreement (with the items in (a) through (c) above being referred to collectively herein as the "**Seller Indemnity Claims**").

Section 7.04    Notice and Defense of Indemnity Claims.    A party hereto agreeing to be responsible for or to indemnify against any matter pursuant to this Agreement is referred to herein as the "**Indemnifying Party**" and a party entitled to indemnification hereunder is referred to herein as the "**Indemnified Party**" and the Purchaser Indemnity Claim or Seller Indemnity Claim (as applicable) giving rise to indemnification as provided herein is referred to as an "**Indemnity Claim**". An Indemnified Party under this Agreement shall give written notice to the Indemnifying Party hereunder with respect to any assertion by the Indemnified Party or by a third party of any Liability which the Indemnified Party has reason to believe might give rise to an Indemnity Claim under this Agreement. Such notice shall set forth in reasonable detail the nature of such action or claim, and include copies of any written complaint, summons, correspondence or other communication from the party asserting the claim or initiating the action. As to any such Indemnity Claim which involves a third party, the Indemnifying Party shall assume and thereafter control the defense of such Indemnity Claim. The Indemnified Party shall be entitled, together with the Indemnifying Party, to participate in the defense, compromise or settlement of any such matter through the Indemnified Party's own attorneys and at its own expense, but the Indemnifying Party shall have control thereof. The Indemnified Party shall provide such cooperation and such access to its books, records and properties as the Indemnifying Party shall reasonably request with respect to such matters and the parties hereto agree to render each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense thereof. An Indemnifying Party shall not make any settlement of any Indemnity Claims, other than Indemnity Claims strictly for monetary damages as to which the Indemnifying Party agrees to be responsible, without the written consent of the Indemnified Party, which consent shall not be unreasonably withheld. Without limiting the generality of the foregoing, it shall not be deemed unreasonable to withhold consent to a settlement involving injunctive or other equitable relief against the Indemnified Party or its assets, employees or business. Notwithstanding the foregoing, in any action or proceeding in which the counsel for the Indemnified Party reasonably determines that counsel chosen by the Indemnifying Party cannot represent both the Indemnified Party and the Indemnifying Party in connection with the defense of any third party claim consistent with the applicable rules of professional conduct, the Indemnified Party shall have the right to employ separate counsel at the Indemnifying Party's expense and to control its own defense in connection therewith.

Section 7.05    Limitations of Indemnity.

(a) No claim may be asserted nor may any Action be commenced against either party for a Purchaser Indemnity Claim or a Seller Indemnity Claim based on a breach of a representation or warranty, unless written notice of such claim or Action is received by such party describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or Action on or prior to the date on which the representation or warranty on which such claim or Action is based ceases to survive as set forth in Section 7.01.

(b) Subject to the qualifications contained in this Section 7.05(b), Sellers shall not be required to make payment for indemnification pursuant to any Indemnity Claim made pursuant to this Article VII unless the Losses in respect of all such claims for which indemnification is sought exceed the Basket Amount (excluding any amount that may be payable in respect of subsections (i), (ii), (iii), (iv), (v) and (vi) of this Section 7.05(b)), at which time Sellers shall be liable for the total amount of Losses.  Subject to the following sentence, in no event shall Sellers' indemnification obligation with respect to claims for indemnification hereunder exceed, in the aggregate, Three Million Dollars ($3,000,000) (the "**Cap**").  The foregoing Basket Amount and Cap limitations shall not apply to claims by Purchaser for: (i) loss of use of Containers; (ii) breaches of representations or warranties related to Taxes, title to the Purchased Assets, or the financial condition of Sellers; (iii) fraud or intentional misrepresentations by Sellers; (iv) pre-Closing Environmental Liabilities; or (vi) breaches of covenants by Sellers; provided, however, that in no event shall Sellers' liability hereunder exceed the Purchase Price.

(c) For purposes of Sellers' obligations to indemnify the Purchaser Indemnitees, the term "Losses" shall not include any matters explicitly included in this Agreement in the calculation of the Purchase Price or any adjustment thereto.

(d) A Purchaser Indemnitee shall not be entitled to recover any Losses relating to any matter arising under one provision of this Agreement to the extent that a Purchaser Indemnitee has already recovered or claimed Losses with respect to such matter pursuant to another provision of this Agreement.

(e) All Losses for which any Indemnified Party would otherwise be entitled to indemnification hereunder shall be reduced by the amount of insurance proceeds, indemnification payments and other third-party recoveries to which any Indemnified Party has received in respect of any Losses incurred by such Indemnified Party (net of any reasonable out-of-pocket costs of recovery of such amounts). In the event that any such insurance proceeds, indemnity payments or other third party recoveries are realized by an Indemnified Party subsequent to receipt by such Indemnified Party of any indemnification payment hereunder in respect of the claims to which such insurance proceeds, indemnity payments or other third-party recoveries relate, appropriate refunds shall be made promptly by the relevant Indemnified Parties of all or the relevant portion of such indemnification payment.

Section 7.06    Brokers.    Each party hereto agrees to indemnify the other and agrees to hold the other harmless against any claim or claims for brokerage or other commission relative to the transactions contemplated herein.

Section 7.07    Reserved.

28

Section 7.08 <u>Exclusive Remedy</u>. Following the Closing, except in in the case of fraud, the indemnification provisions contained in this Article VII will constitute the sole and exclusive recourse and remedy of the parties with respect to any claim arising from this Agreement or the transactions contemplated hereby, whether by contract, statute, tort or otherwise. Notwithstanding the foregoing, the provisions of this Article VII will not restrict the right of any party to seek specific performance or other equitable remedies in connection with any breach of any of the covenants contained in this Agreement. The parties hereto agree that the provisions in this Agreement relating to indemnification, and the limits imposed on the party's remedies with respect to this Agreement and the transactions contemplated hereby were specifically bargained for between sophisticated parties and were specifically taken into account in the determination of the amounts to be paid hereunder.

## ARTICLE VIII -  CONDITIONS PRECEDENT TO CLOSING

Section 8.01 <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>. The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction or waiver of the following conditions:

(a) On the Closing Date, (i) no material Legal Requirement shall have been enacted, entered, issued, promulgated or enforced by any Governmental Authority that prohibits or substantially restrains any of the transactions contemplated by this Agreement or that substantially delays any material aspect of the transactions contemplated by this Agreement, and (ii) no Action shall have been commenced by any Governmental Authority with jurisdiction over the Purchased Assets or any other Person before any Governmental Authority that seeks to restrain, materially and adversely alter or render unlawful the consummation any of the transactions contemplated by this Agreement or that would substantially delay any material aspect of the transactions contemplated by this Agreement; provided, however, that Purchaser or Sellers, as the case may be, may not invoke the condition in this <u>Section 8.01</u> if (i) Purchaser or Sellers, as the case may be, shall have failed in any material respect to use its commercially reasonable efforts to oppose, contest, resolve, appeal, defend against or lift, as applicable, such Legal Requirement, or (ii) compliance with any such Legal Requirement described in <u>Section 8.01(a)</u> or the relief sought by the Governmental Authority in any such Action described in <u>Section 8.01(b)</u> would not reasonably be expected to have a material adverse effect on Sellers or Purchaser.

(b) All permits and approvals, if any, required by applicable Legal Requirements to be obtained from any Governmental Authority to consummate the Closing shall have been obtained, except for those whose failure to be obtained will not result in a material adverse effect on the Purchased Assets, Business or Purchaser, as applicable.

Section 8.02 <u>Conditions to Purchaser's Performance</u>. Purchaser's obligations to purchase and pay the Purchase Price for the Purchased Assets are subject to the satisfaction or waiver of the following conditions:

(a) The representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date (as if made on the Closing Date), and Sellers shall have delivered to Purchaser a certificate to such effect,

dated as of the Closing Date and signed by an authorized representative of Sellers, which certificate shall be in form and substance reasonably satisfactory to Purchaser.

(b) All of the covenants of Sellers set forth herein and which were to be performed at or prior to the Closing Date (including the delivery of the items set forth in Section 10.02) shall have been duly performed in all material respects, and Sellers shall certify to such effect in the certificate provided for in Section 8.02(a) hereof.

(c) The continued existence of sufficient Debtor-in-Possession ("**DIP**") financing to facilitate and close the transactions contemplated herein.

(d) The Cure Cost for the Compton Lease is $0.

(e) Purchaser shall be reasonably satisfied with the Disclosure Schedules.

(f) Purchaser shall be reasonably satisfied with the results of its due diligence investigations of the Purchased Assets.

(g) There shall not have been instituted or threatened, in writing, on or before the Closing Date, any Action before any Governmental Authority challenging the validity of this Agreement or seeking to prevent or materially delay the acquisition of the Purchased Assets or the Business as contemplated hereby.

(h) There shall not have been any material adverse change in the assets, operations or financial condition of Sellers, or any event or series of events that could reasonably likely be expected to result in a material adverse change in the assets, operations or financial condition of Sellers of which Purchaser becomes aware after December 1, 2022.

(i) Sellers and other required parties shall have executed and delivered the Transition Services Agreement, the Bill of Sale, the Assignment and Assumption Agreement and the other instruments provided for herein, and such other documents, reasonably satisfactory to Purchaser's counsel, as shall be necessary or appropriate to the transfer of the Purchased Assets and the Business to Purchaser.

(j) Any and all third party consents required to assign the Purchased to Purchaser shall have been obtained.

(k) [Reserved] .

(l) The Court shall have entered the Sale Order, transferring the Purchased Assets free and clear of all Liens (except Permitted Liens) and including that Purchaser is a good faith purchaser entitled to protections of 363 (m) and (n), on or prior to December 9, 2022 (or within three (3) Business Days thereafter for good cause shown by Debtors), which shall include a waiver of the stay in Bankruptcy Rules 6004(h), 6006(d) and Local Rule 6004-1, and such Sale Order shall be a Final Order.

(m) The board of directors or similar governing body of Purchaser shall have approved the transactions contemplated hereunder.

Section 8.03    <u>Conditions to Sellers' Performance</u>.    Sellers' obligations pursuant to this Agreement are subject to satisfaction or waiver of the following conditions:

(a) The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date (as if made on the Closing Date), and Purchaser shall have delivered to Sellers a certificate to such effect, dated as of the Closing Date and signed by its Chief Financial Officer or a Vice President, which certificate shall be in form and substance reasonably satisfactory to Sellers.

(b) All of the covenants of Purchaser set forth herein and which were to be performed at or prior to the Closing Date (including the delivery of items pursuant to <u>Section 10.03</u>) shall have been duly performed in all material respects and Purchaser shall certify to such effect in the certificate provided for in <u>Section 8.03(a)</u> hereof.

(c) There shall not have been instituted or threatened, in writing, on or before the Closing Date, any action or proceeding before any Governmental Authority challenging the validity of this Agreement or seeking to prevent or materially delay the acquisition of the Purchased Assets or the Business as contemplated hereby.

(d) All other agreements, certificates and documents reasonably requested from Purchaser by Seller shall have been fully executed and delivered by Purchaser along with such other documents reasonably satisfactory to Seller or its counsel, as shall be necessary or appropriate to the transfer of the Purchased Assets and Business to Purchaser.

## ARTICLE IX -  TERMINATION

Section 9.01    <u>Termination Prior to Closing</u>.    Notwithstanding anything in this Agreement to the contrary, this Agreement and the transactions contemplated by this Agreement may not be terminated prior to Closing, except as follows:

(a) by mutual consent in writing of Purchaser and Sellers;

(b) by Sellers or Purchaser at any time after December 16, 2022 (or such later date as shall be necessary to permit a party to fully exercise any cure rights it may have under this <u>Section 9.01</u>) (the "**Outside Date**"); provided, that the right to terminate this Agreement under this <u>Section 9.01(b)</u> shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur by such date;

(c) automatically if Sellers enter into a definitive agreement that contemplates a transaction or series of related transactions, other than the transactions to be consummated under this Agreement, pursuant to which a material portion of the Purchased Assets will be acquired by, or transferred to, a third party, whether pursuant to an asset sale, merger, stock purchase, a chapter 11 plan or otherwise (any such transaction, an "**Alternative Transaction**");

(d) by Purchaser, by giving written notice of such termination to Sellers, if the Sale Order has not been entered on or before December 9, 2022 (or three (3) Business Days

thereafter for good cause shown by Debtors) (the "**Sale Order Outside Date**") or if such Sale Order is subject to a stay or injunction on the Sale Order Outside Date;

(e) by Purchaser, if there is any material breach declared by the DIP lender (which remains uncured and not waived or subject to forbearance by the DIP lender) or termination of the DIP financing;

(f) by Purchaser, if there is any material adverse change to the Business of which Purchaser becomes aware after December 1, 2022;

(g) by Purchaser, if there is conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code;

(h) by Purchaser, if there is dismissal of the Bankruptcy Cases;

(i) by Sellers or Purchaser, if any Legal Requirement of a Governmental Authority of competent jurisdiction prohibits the consummation of the transactions contemplated by this Agreement, and such Legal Requirement has become final and non-appealable and was not entered at the request of the terminating party; provided, however, that Sellers or Purchaser, as the case may be, may not invoke the condition in this Section 9.01(e) if (i) Sellers or Purchaser, as the case may be, shall have failed to in any material respect to use its commercially reasonable efforts to oppose, contest, resolve, appeal, defend against or lift, as applicable, such Legal Requirement, or (ii) compliance with any such Legal Requirement described in Section 8.01(a) would not reasonably be expected to have a material adverse effect on Sellers or Purchaser, as the case may be; or

(j) by Purchaser, if (i) there has been a breach by Sellers of any representation or warranty of Sellers contained in this Agreement which would reasonably be expected to have a material adverse effect on the Purchased Assets or the Business or to prevent or delay the consummation of the transactions contemplated by this Agreement beyond the Outside Date, and which breach is not curable or, if curable, has not been cured within five (5) days after written notice of such breach by Purchaser to Sellers, or (ii) there has been a breach by Sellers of any of the covenants or agreements of Sellers set forth in this Agreement which would reasonably be expected to have a material adverse effect on the Purchased Assets or the Business, or to prevent or delay the consummation of the transactions contemplated by this Agreement beyond the Outside Date, and which breach is not curable or, if curable, has not been cured within five (5) days after written notice of such breach by Purchaser to Sellers; or

(k) by Sellers, if (i) there has been a breach by Purchaser of any representation or warranty of Purchaser contained in this Agreement which would reasonably be expected to have a material adverse effect on Purchaser, or prevent or delay the consummation of the transactions contemplated by this Agreement beyond the Outside Date, and which breach is not curable or, if curable, has not been cured within five (5) days after written notice of such breach by Sellers to Purchaser or (ii) there has been a breach by Purchaser of any of the covenants or agreements of Purchaser set forth in this Agreement which would reasonably be expected to have a material adverse effect on Purchaser, or to prevent or delay the consummation of the transactions contemplated by this Agreement beyond the Outside Date,

and which breach is not curable or, if curable, has not been cured within five (5) days after written notice of such breach by Sellers to Purchaser.

Section 9.02    Effect of Termination.    In the event that this Agreement shall be terminated pursuant to Section 9.01, all further obligations of the parties under this Agreement shall terminate without further liability of any party to another; provided, however, that the obligations of the parties contained in this Section 9.02 and Articles XI through XV shall survive any such termination.    In addition to the foregoing, in the event Purchaser fails to consummate the transactions contemplated by the terms of this Agreement for any reason not specifically provided herein, Sellers shall be entitled to seek and/or obtain all available legal and equitable remedies.

Section 9.03    Break Up Fee and Expense Reimbursement.

(a)    In consideration of Purchaser's due diligence, good faith negotiations of and entering into this Agreement, and as reimbursement of Purchaser's expenses incurred in connection with the transactions contemplated by this Agreement, Sellers shall pay to Purchaser in accordance with Section 9.04 and Section 9.05, (x) a break-up fee in the amount of $177,000 (the "**Break-up Fee**"), payable as provided in Section 9.04; and (y) an amount not to exceed $100,000, equal to Purchaser's expenses incurred in connection with this Agreement and the transactions contemplated herein and therein, including Purchaser's legal and accounting expenses, due diligence (including travel expenses), all work performed by or on behalf of Purchaser to prepare the Purchased Assets for transition to Purchaser upon or soon after Closing, the prosecution of Court approval of Purchaser as a good faith buyer under this Agreement and the acquisition of the Purchased Assets and the entry of the Sale Order (the "**Expense Reimbursement**").

(b)    Sellers acknowledge and agree that (i) the payment of the Break-Up Fee and the Expense Reimbursement are integral parts of this Agreement, and (ii) in the absence of Sellers' obligation to make these payments, Purchaser would not have entered into this Agreement.    To the extent that all amounts due in respect of the Break-Up Fee and the Expense Reimbursement pursuant to this Section 9.03 have actually been paid by Sellers to Purchaser, Purchaser shall not have any additional recourse against Sellers for any liabilities relating to or arising from this Agreement. Further, prior to the Closing in the event of any breach of this Agreement by Sellers, the sole and exclusive remedies of Purchaser will be, if applicable, to (i) terminate this Agreement pursuant to Section 9.01, and (ii) receive, if applicable, any payments payable pursuant to this Section 9.03.

Section 9.04    Payment of Break-Up Fee.    Purchaser shall earn the Break-up Fee upon Sellers' acceptance of a bid for an Alternative Transaction and shall be due and owing by Sellers pursuant to this Agreement, and paid after obtaining Court approval, which Sellers shall seek no later than Court approval of the Alternative Transaction, and will be paid from the proceeds received by Sellers from such Alternative Transaction.

Section 9.05    Payment of Expense Reimbursement.    If Purchaser becomes entitled to Expense Reimbursement, then the Expense Reimbursement shall be paid to Purchaser by Seller pursuant to this Agreement, and paid in accordance with and at the same time as the Break-Up Fee becomes due and payable.

33

Section 9.06  Payment of Deposit.  Purchaser's Deposit shall be non-refundable and paid to Sellers in the event that this Agreement is terminated pursuant to Section 9.01(k). In the event that this Agreement is terminated pursuant to any other provision of Section 9.01, Purchaser's Deposit shall be refunded to Purchaser.

## ARTICLE X -  CLOSING

Section 10.01 Closing Date.   Subject to the terms and conditions herein contained, the parties agree to close this transaction (the "**Closing**") by electronic exchange of documents, effective on such date following the entry of the Sale Order as the parties may agree (the "**Closing Date**"), or on such other date and at such other place as the parties may agree upon in writing.

Section 10.02 Sellers' Deliveries at Closing.   On the Closing Date, Sellers shall deliver or cause to be delivered to Purchaser the following:

(a) a duly executed bill of sale for the Purchased Assets, substantially in the form of Exhibit 10.02(a) (the "**Bill of Sale**"), together with appropriate certificates of title or other evidences of Sellers' ownership of the Purchased Assets, and duly executed copies of all instruments and agreements among or between Purchaser and Sellers provided for herein;

(b) duly executed agreements and instruments of assignment and assumption, substantially in the form of Exhibit 10.02(b) (the "**Assignment and Assumption Agreement**");

(c) a duly executed copy of the Transition Services Agreement substantially in the form of Exhibit 10.02(c) (the "**Transition Services Agreement**" and collectively with the Bill of Sale, Assignment and Assumption Agreement and all certificates and ancillary documents delivered at Closing are referred to collectively herein as the "**Ancillary Documents**");

(d) duly executed lease for the Woodland Property;

(e) the certificates described in Section 8.02(a) and Section 8.02(b) hereof, duly executed by authorized officers of Sellers;

(f) a certificate duly executed by an officer of Sellers certifying (i) the current articles of organization of each of MagneGas and MagneGas RE (certified by the Department of State of such Seller's state of organization); (ii) the current operating agreement of each of MagneGas and MagneGas RE; and (iii) written resolutions duly adopted by the manager of each of MagneGas and MagneGas RE approving this Agreement, the transactions contemplated hereby and the performance of MagneGas and MagneGas RE in respect thereof;

(g) a certificate duly executed by an officer of Parent, certifying (i) the current certificate of incorporation of Parent (certified by the Secretary of State of the State of Delaware); (ii) the current bylaws of Parent; and (iii) written resolutions duly adopted by the Board of Directors of Parent approving this Agreement, the transactions contemplated hereby and the performance of Parent in respect thereof;

34

(h) a good standing certificate (or its equivalent) for MagneGas from the Secretary of State of the State of California;

(i) a good standing certificate (or its equivalent) for MagneGas RE from the Secretary of State of the State of Delaware; and

(j) a good standing certificate (or its equivalent) for Parent from the Secretary of State of the State of Delaware.

Section 10.03  <u>Purchaser's Deliveries at Closing</u>.   At Closing, Purchaser shall deliver or cause to be delivered to Sellers, as applicable, the following:

(a) wire transfer of the Cash Closing Payment to the account(s) designated to Purchaser pursuant to <u>Section 3.04(b)</u>;

(b) duly executed lease for the Woodland Property;

(c) duly executed copies of the Ancillary Documents;

(d) the certificates described in <u>Section 8.03(a)</u> and <u>Section 8.03(b)</u> hereof, duly executed by an authorized officer of Purchaser; and

(e) a certificate of good standing for Purchaser from the Secretary of State of Delaware.

## ARTICLE XI -  EXPENSES

Section 11.01  <u>Expenses</u>.   Whether or not the transactions contemplated by this Agreement are consummated, each of the parties hereto shall pay the fees and expenses of such party's respective legal counsel, accountants, other experts and any other expenses incurred by such party incident to the negotiation, preparation and execution of this Agreement, except as provided in <u>Section 9.02</u> (Break-up Fee and Expense Reimbursement).

## ARTICLE XII -  RELEASE

Section 12.01  <u>Release by Sellers</u>.  Effective upon the Closing, each Seller (on behalf of such party and such party's heirs, successors, assigns and executors) hereby irrevocably and unconditionally waives, releases and discharges Purchaser and the other Purchaser Indemnitees (and their successors and assigns) from any and all Losses, Liabilities and obligations to such party of any kind or nature whatsoever, whether in such Person's capacity as a party hereunder, as an equityholder, director, manager, officer or employee of any Seller or otherwise (including in respect of rights of contribution or indemnification and including any Avoidance Action) as to facts, conditions, transactions, events or circumstances prior to the Closing.  No Seller shall seek to recover any amounts in connection therewith or thereunder from Purchaser and/or any other Purchaser Indemnitee (and/or any of their successor or assigns); provided, that this <u>Section 12.01</u> shall not affect the rights of any Seller under this Agreement or the Woodland PA.  Each Seller represents to Purchaser that such party has not assigned or transferred, or purported to assign or transfer, to any Person, all or any part of, or any interest in, any Action against any Seller, and

notwithstanding anything to the contrary in this Agreement, no such assignment or transfer shall be permitted and any purported assignment or transfer shall be legally ineffective.

Section 12.02  Release by Purchaser.  Effective upon the Closing, Purchaser (on behalf of itself and on behalf of the Purchaser Indemnitees) hereby irrevocably and unconditionally waives, releases and discharges each Seller (and their successors and assigns) from any and all Losses, Liabilities and obligations to such party of any kind or nature whatsoever, whether in such Person's capacity as a party hereunder, as an equityholder, director, manager, officer or employee of Purchaser or otherwise (including in respect of rights of contribution or indemnification) as to facts, conditions, transactions, events or circumstances prior to the Closing.  None of Purchaser nor any Purchaser Indemnitee shall seek to recover any amounts in connection therewith or thereunder from any Seller (and/or any of their successor or assigns); provided, that this Section 12.02 shall not affect the rights of Purchaser or any Purchaser Indemnitee under (a) this Agreement or the Woodland PA, (b) under the Asset Purchase Agreement dated as of August 3, 2022 by and among Purchaser, Parent, MagneGas Welding Supply – Southeast, LLC and, solely for the purposes described in such agreement, Seller, or (c) any negotiation regarding, or any agreement entered into by Purchaser and any Seller with respect to the assets of any Seller used in the operation of its business in the State of Texas.  Purchaser represents to each Seller that it has not assigned or transferred, or purported to assign or transfer, to any Person, all or any part of, or any interest in, any Action against Purchaser and the other Purchaser Indemnitees, and notwithstanding anything to the contrary in this Agreement, no such assignment or transfer shall be permitted and any purported assignment or transfer shall be legally ineffective.

## ARTICLE XIII -  CONSTRUCTION; WAIVER OF JURY TRIAL

Section 13.01  Choice of Law; Venue; Waiver.    This Agreement and the agreements appended hereto and delivered herewith shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without reference to its principles of conflicts of law.  The Parties hereby irrevocably and unconditionally consent to and submit to the exclusive jurisdiction of the Courts and if the Court does not have jurisdiction, then to the courts of the State of Delaware and of the United States of America located in such state (the "**Delaware Courts**"), for any litigation arising out of or relating to this Agreement (and agree not to commence any litigation relating thereto except in such courts), consent to the jurisdiction of all courts to which an appeal may be taken from such courts, waive any objection to the laying of venue of any such litigation in the Delaware Courts, agree not to plead or claim in any Delaware Court that such litigation brought therein has been brought in any inconvenient forum, and agree not to attempt to deny or defeat personal jurisdiction by motion or other request for leave from such courts. EACH PARTY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

Section 13.02  Dispute Resolution.  The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between representatives who have authority to settle the controversy.  All reasonable requests for information made by one party to the other shall be honored.  All negotiations and exchange of

36

documents and other information pursuant to this paragraph are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence. If the dispute cannot be settled through negotiation within ten (10) days of the initial notice, either party shall have the right to pursue litigation as provided in <u>Section 13.01</u>. The parties hereto are sophisticated parties and have access to legal representation of their choosing. No provision of this Agreement or any Ancillary Document will be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or drafted such provision.

Section 13.03 <u>Headings</u>. All headings contained in this Agreement are for reference only and shall not affect the meaning or interpretation of this Agreement in any manner.

Section 13.04 <u>Interpretation</u>. The use of the words "include", "includes" or "including" shall be deemed to be followed by the words "without limitation". Purchaser and Sellers and their respective counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the parties, and the language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

Section 13.05 <u>Invalid Provisions</u>. Should any part of this Agreement for any reason be declared invalid, such decision shall not affect the validity of any other portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid provisions thereof eliminated, and it is the declared intention of the parties hereto that they would have executed the remaining portion of the Agreement without including therein any such part or portion which may be declared invalid.

Section 13.06 <u>No Third Party Beneficiaries</u>. Nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

## ARTICLE XIV - ASSIGNABILITY

Section 14.01 <u>Binding Agreement</u>. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto, their heirs, legal representatives, successors and permitted assigns.

Section 14.02 <u>Assignability</u>. This Agreement shall not be assignable in whole or in part by any party except with the consent in writing of the other parties, which consent shall not be unreasonably withheld, conditioned or delayed. Any purported assignment without such consent shall be void.

## ARTICLE XV - NOTICES

Section 15.01 <u>Written Notices</u>. All notices pursuant to this Agreement shall be in writing.

Section 15.02 <u>Notice to Purchaser</u>. Unless otherwise specified herein, all notices, demands, requests, or other communications which may be or are required to be given to, served upon or sent pursuant to this Agreement shall be in writing and shall be deemed given or sent three

(3) days after deposit, as registered or certified mail, postage and fees prepaid, in the United States mail; the day after delivery to Federal Express, United Parcel Service, or other nationally recognized courier service, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted to the recipient by electronic means and such transmission is electronically confirmed as having been successfully transmitted and delivered:

|              |                                          |
|--------------|------------------------------------------|
| Purchaser:   | Airgas USA, LLC                          |
|              | 259 N. Radnor-Chester Road               |
|              | Suite 100l                               |
|              | Radnor, PA 19087                         |
|              | Attention:  Office of the General Counsel |

|                 |                                 |
|-----------------|---------------------------------|
| With a copy to: | Kleinbard LLC                   |
|                 | Three Logan Square              |
|                 | 1717 Arch Street,               |
|                 | Philadelphia, PA 19103          |
|                 | Attention: Mary Beth H. Gray    |
|                 | Email: mgray@kleinbard.com      |

Section 15.03  Notice to Sellers.   Unless otherwise specified herein, all notices, demands, requests, or other communications which may be or are required to be given to, served upon or sent pursuant to this Agreement shall be in writing and shall be deemed given or sent three (3) days after deposit, as registered or certified mail, postage and fees prepaid, in the United States mail; when delivered to Federal Express, United Parcel Service, or other nationally recognized courier service, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted to the recipient by electronic means and such transmission is electronically confirmed as having been successfully transmitted and delivered:

|          |                                          |
|----------|------------------------------------------|
| Sellers: | MagneGas Welding Supply – West, LLC      |
|          | 24980 N. 83rd Avenue                |
|          | Peoria, AZ  85383                        |
|          | Attention:  Jered Ruyle                  |
|          | Email: jeredruyle@magnegas.com           |
|          |                                          |
|          | MagneGas Real Estate Holdings, LLC       |
|          | 24980 N. 83rd Avenue                |
|          | Peoria, AZ  85383                        |
|          | Attention:  Jered Ruyle                  |
|          | Email: jeredruyle@magnegas.com           |

With copies to:                 Taronis Fuels, Inc.
                                24980 N. 83rd Avenue
                                Peoria, AZ  85383
                                Attention:  Jered Ruyle
                                Email: jeredruyle@magnegas.com

                                Potter Anderson & Corroon LLP
                                1313 North Market Street, Sixth Floor
                                Wilmington, DE 19801-6108
                                Attention: Jeremy Ryan
                                Email: jryan@potteranderson.com

### ARTICLE XVI -  FURTHER ASSURANCES AND MISCELLANEOUS

Section 16.01 <u>Entire Agreement, No Oral Change</u>.   This Agreement, together with the schedules and exhibits hereto and all agreements contemplated by this Agreement, embodies the entire agreement between the parties hereto and supersedes any and all prior agreements and understandings between the parties hereto, including the Letter of Intent signed by the parties on or about December 8, 2021.  This Agreement may only be changed by written instrument signed by the parties hereto.  Any waiver of any right hereunder must be in writing.

Section 16.02 <u>Risk of Loss</u>.   Pending Closing, Sellers shall bear the risk of loss of or damage to the Purchased Assets.  Sellers shall promptly notify Purchaser in the event of any material loss to the Purchased Assets.

Section 16.03 <u>Confidentiality of Information</u>.   For five (5) years after the date hereof, each Seller shall, and shall cause its respective Affiliates and representatives to, hold in confidence and not use any confidential information of any party, whether written or oral, concerning Sellers, Purchaser, any of Purchaser's Affiliates or the Business, except that Sellers may use such confidential information to perform such party's obligations pursuant to employment with Purchaser after the Closing and for the sole and exclusive benefit of Purchaser.  If Sellers or any of their respective Affiliates or representatives are compelled to disclose any confidential information by judicial or administrative process or by other requirements of law, such party shall promptly notify Purchaser in writing and shall disclose, or shall use reasonable efforts to cause its Affiliates to disclose, only that portion of such confidential information which such party is advised by counsel in writing is legally compelled to be disclosed.

Section 16.04 <u>Reportable Transaction</u>.   The parties acknowledge and agree that nothing in this Agreement shall be construed to restrict any party from disclosing the tax treatment and/or tax structure of any transaction.

Section 16.05 <u>Counterparts; Electronic Signatures</u>.   This Agreement may be executed in two (2) or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. This Agreement and any other agreement, document or instrument executed in connection herewith, may be signed and the

signatures transmitted by facsimile or electronic .pdf and any such faxed or electronic copy shall be treated and considered as a binding signed original of the subject document for all purposes.

[The rest of this page intentionally left blank]

The parties hereto have executed this Agreement as of the day and year first above written by their duly authorized representatives.

PURCHASER:

AIRGAS USA, LLC

By:_____

Frederic Bergeret, Chief Financial Officer

SELLER:

MAGNEGAS WELDING SUPPLY- WEST, LLC

By:_____

[Name, Title]

SELLER:

MAGNEGAS REAL ESTATE HOLDINGS, LLC

By:_____

[Name, Title]

SELLER:

TARONIS FUELS, INC.

By:_____

[Name, Title]

*Signature Page to Asset Purchase Agreement*

The parties hereto have executed this Agreement as of the day and year first above written by their duly authorized representatives.

**PURCHASER:**

**AIRGAS USA, LLC**

By:_____

[_____]

**SELLER:**

**MAGNEGAS WELDING SUPPLY- WEST, LLC**

By: _R. ƒll Rnl_     President - CEO
[Name, Title]

**SELLER:**

**MAGNEGAS REAL ESTATE HOLDINGS, LLC**

By: _R. ƒll Rnl_     President - CEO
[Name, Title]

**SELLER:**

**TARONIS FUELS, INC.**

By: _R. ƒllRnl_     President - CEO
[Name, Title]

41